## AUSTIN v. HAYDEN.

1. BROKERS—INSOLVENCY—PLEDGES—ACCOUNTING.

On an accounting between a stock broker and a correspondent firm that had pledged stock to secure advances made in purchasing stock for customers of such correspondent brokers, it was proper to disallow an item charged by the pledgee for fees of an expert accountant that was employed by the pledgee to examine the books and ascertain the financial condition of the correspondent firm for the information and benefit of the former.

2. SAME—PLEDGES—LIEN FOR ADVANCES.

A broker has a lien on all stocks purchased by him for a customer to secure an unpaid balance of the purchase price.

3. SAME—PURCHASE ON MARGIN—TITLE—STOCK.

The purchaser of stock on margin, through a broker, becomes the owner of the stock subject to his broker's lien.

4. SAME—LIEN OF PLEDGEE.

A pledge is something more than a simple lien: it is a deposit or delivery of possession and control of property as security for a debt, vesting a right to the property in the pledgee to the full extent necessary to protect and collect the debt.

5. SAME—STOCK—NEGOTIABILITY—EQUITIES.

While certificates of stock indorsed in blank are not strictly speaking negotiable paper, under the law merchant, like promissory notes or bills of exchange, yet the recognized usage of indorsing certificates in blank and so transferring title by delivery, has given them a *quasi* negotiable charac-

ter so as to free the stock from undisclosed antecedent equities as it passes from hand to hand.

6. SAME—SUBPLEDGE—MARGINS.

Brokers, purchasing stock for a customer on margins, have a right to subpledge the shares *en bloc* with other purchases to obtain money for the purpose of carrying the stock for their clients.

7. SAME—DUTY—PRINCIPAL AND AGENT.

As between broker and customer, it is the duty of the former to have available at all times stock of the kind and quantity purchased by the customer whenever full payment should be made.

8. SAME—FRAUD—CONVERSION.

To pledge stock in the broker's hands after he has received payment in full, or where stock has been left with him for safe keeping, or for transfer, is a fraud of a criminal character.

9. SAME—TRANSFEREE OF STOCK.

But as to a third person who, in good faith, has advanced funds on the security of stock in the broker's hands indorsed in blank, but pledged without right, the owner may be estopped from maintaining title and must bear the loss.

10. SAME—GOOD FAITH—INDORSEE.

Customers of an insolvent brokerage firm, by intrusting stock to the firm indorsed in blank, or by authorizing the firm to purchase stock for them through the ordinary channels of trade, invested such brokers with the *indicia* of ownership, putting it in the power of the firm to perpetrate the frauds complained of, and, as against an innocent pledgee, are barred by the principle of estoppel from asserting a paramount title.

11. SAME—GOOD FAITH—WORDS AND PHRASES.

Good faith requires an absence of participation in the fraud or collusion with the wrongdoer and absence of knowledge or notice thereof, and also of notice of such facts and circumstances as should put an ordinarily prudent business man on inquiry.

12. SAME—BONA FIDE PURCHASERS.

Defendants, a partnership engaged in the business as stock brokers in Boston, Mass., acted as the eastern agents of a firm of brokers in Detroit, Mich., for a number of years, holding stock purchased in behalf of customers of the Detroit brokers as collateral security for funds advanced to purchase stock on margins or otherwise. They knew that such stocks

were not the property of the Detroit brokers, and that the certificates of stock in their hands were subpledged by the Michigan partnership, but supposed that the latter were solvent. Becoming straitened in finances, the Detroit firm forwarded to its eastern correspondents stock entrusted by customers for safekeeping or for transfer, not advising the transferees of any equities against the collateral; also drew frequent drafts upon their balance of credit in defendant's hands, wiring to defendants funds to meet the paper as the same became necessary; also reshipping stock to the Boston firm that had recently purchased and forwarded the same to Detroit. Numerous drafts of the insolvent firm were allowed to go to protest, deliveries of stock were delayed, and several applications for additional credit were refused by defendant brokers. Complaints of delayed deliveries had been made by insolvent's customers to defendant brokers. In June the latter sent an agent to Detroit to check over the amount of margins which the Detroit brokers obtained from customers; later taking over all the business the insolvents had in New York and Boston, by purchasing of other brokerage firms the securities held by them, amounting to about a million dollars. On the following day, June 23d, defendant partnership commenced an examination of the books of the insolvent firm. *Held*, that they were chargeable with constructive notice of insolvency and fraudulent dealings of the Detroit firm from June 23d.

13. Same—Conversion—Joint Tort Feasors.

Having notice thereafter of equities of customers of the Detroit brokers, they were jointly liable with the latter for wrongful acts in relation to stock held in safekeeping for customers, and stock held for transfer or otherwise in trust.

14. Bankruptcy—Insolvency—Jurisdiction of State and Federal Courts—Trusts.

After suit involving the insolvent's rights in pledged stock held by their brokers in Boston had been instituted by a receiver of the insolvent, whom the bankruptcy court later appointed trustee, in courts of this State, the jurisdiction of the State court was not divested by an adjudication of bankruptcy in the Federal court.

15. Receivers—Trusts—Expenses.

Expenses incurred in collecting assets of an insolvent under the order of the court, should be allowed to the receiver or trustee out of the funds obtained, and are chargeable *pro rata* to the creditors.

Appeal from Wayne; Mandell, J.  Submitted January 3, 1912.  (Docket No. 2.)  Decided July 11, 1912.

Bill by Fred G. Austin as receiver of Cameron Currie & Company, a copartnership, against Charles Hayden and others, copartners, doing business as Hayden, Stone & Company, for an accounting, an injunction, and other relief.  Complainant, being later appointed trustee in bankruptcy of Cameron Currie & Company, was substituted as such trustee.  From a decree for complainant, complainant and defendants and certain intervening creditors appeal.  Modified and affirmed.

*Boynton, McMillan, Bodman & Turner*, for complainant.

*Stevenson, Carpenter & Butzel* (*Henry W. Beals*, of counsel), for defendants.

*F. H. & G. L. Canfield*, for interveners Charles Stinchfield and others.

*Gray & Gray*, for intervener Donald Fuller.

*Miller, Smith, Paddock & Perry*, for intervener A. H. Sibley, administrator.

*Smith, Baldwin & Alexander* (*D. B. Hayes* and *Miller, Smith, Paddock & Perry*, of counsel), for intervener Ambrose B. Park.

*Warren, Cady & Ladd*, for interveners Curtis and Wood.

*Bowen, Douglas, Eaman & Barbour*, for interveners William R. Croul Estate and others.

*Orla B. Taylor* and *Charles F. Delbridge*, for interveners Fritz Goebel and others.

*Elbridge F. Bacon*, for intervener Henry K. Bacon.

*Bernard B. Selling* and *Alfred J. Ducharme*, for interveners Newberry and Hendrie.

STEERE, J. The bill of complaint in this suit is field by Fred G. Austin, as receiver of Cameron Currie & Co., an insolvent firm. Its general purpose, briefly stated, is to obtain an accounting as to the transactions between defendants and said insolvent firm, an adjudication of the respective rights of numerous creditors of said Cameron Currie & Co., to restrain said creditors from instituting separate proceedings in relation thereto and to allow them to intervene herein, and, pending these proceedings, to enjoin defendants from selling or disposing of certain enumerated stocks and bonds which they held as collateral security, and in which complainant, as receiver, and said creditors claimed an interest.

Complainant was appointed such receiver by the Wayne county circuit court on July 18, 1908. For some years prior to that time the firm of Currie & Co. was extensively engaged in a general brokerage business in the city of Detroit, Mich., buying, selling and exchanging stocks, bonds, and other securities and assets upon commission according to the usual customs and course of business of stockbrokers throughout the country. They had a large number of customers who dealt in stocks and bonds through them, buying and selling in the usual manner, some outright for cash, but the greater number dealing upon margins. The firm held memberships in New York and Boston stock exchanges, kept accounts with eastern brokerage firms, and maintained close relations with the market by private wires and other general facilities for obtaining stock reports and speedily transacting such business as is commonly done by well-organized brokerage establishments.

Defendants were bankers and brokers in the city of Boston, also having an office in the city of New York, under the partnership name of Hayden, Stone & Co. For several years Currie & Co. had kept an account with and dealt extensively through them, ordering the purchase and sale of stocks and bonds and other securities from time to time as their eastern business demanded.

At the time complainant was appointed receiver, Hayden, Stone & Co. were Currie & Co.'s only eastern correspondents. They claimed, as a result of many and extensive brokerage transactions between the two firms, a large percentage of which was buying and selling on margins, that Currie & Co. were indebted to them in the sum of $1,340,282.83, for which indebtedness they held as collateral various stocks and bonds, amounting at the then market value to $1,576,567.

The method of dealing on margins, out of which this indebtedness grew, is well and clearly stated by the learned circuit judge who tried this case, as follows:

"By a 'marginal' purchase is usually meant a purchase where the full price or cost of the stock purchased is not given to the stockbroker at the time of the execution of the order of the customer, without regard to the percentage of the unpaid balance thereon, and without regard to whether the purchase was made as an investment with the expectation on the part of the customer of later making full payment and acquiring the ultimate possession of the stock, or as a speculation with the intention of selling the stock upon a rise in the market, and without any intention of making full payment therefor, or acquiring possession of the stock purchased. This definition of purchase on margin will be adopted in what will be said of the transactions involved in the determination of the issues herein. Every accepted order of a customer of Currie & Co. was actually executed by it through other brokers in the appropriate stock exchanges. As the orders of purchase of shares of stock upon which but a small margin had been advanced by the customer aggregated very large sums of money, the execution of the orders called for the advancing of large amounts by Currie & Co. or by those who executed its orders in the stock exchanges in Boston and New York. And in all purchase transactions, whether upon margin or otherwise, because of the distance between Detroit and the exchanges where the stocks were purchased, and because of the fact that payment for stocks in the stock exchanges were practically cash transactions, large amounts of money had to be advanced by the house through whom the orders were executed."

Complainant was appointed receiver, on application of

Currie himself, head of the firm, who alleged, among other things, that the firm was then insolvent. It appears from the evidence that this condition had existed for more than a year, the insolvency, which amounted to upwards of $300,000 prior to July, 1907, having continuously increased, until, at the time of the appointment of the receiver, it much exceeded $500,000.

It had become manifest shortly before complainant was appointed that Currie & Co. had exhausted their credit and all resources within their control, and were hopelessly involved. Hayden, Stone & Co. had put agents in charge of Currie & Co.'s office and made an examination of their books, following which, Mr. Hayden, on July 13, 1908, served formal notice on Mr. Currie that he must go into the hands of a receiver. When application was accordingly made for the appointment of a receiver, one of defendant's agents, under instructions from defendant, at once took full possession and charge of Currie & Co.'s offices, and proceeded to conduct a brokerage business there in the name of Hayden, Stone & Co. Complainant, learning that it was the intention to make immediate sale of all stocks and securities held by Hayden, Stone & Co., as collateral for Currie & Co.'s indebtedness to them, began this suit on July 22, 1908, and obtained a preliminary injunction restraining such action. His bill of complaint was subsequently amended, containing more comprehensive and detailed averments and allegations, and a fuller prayer for relief.

The court also made an order, which was entered as of July 22, 1908, permitting Currie & Co.'s creditors, or any third party claiming ownership of interest "in any stocks or bonds held by defendants herein, growing out of transactions between the defendants and Currie & Co.," to intervene by petition at any time before the 10th of August, 1908. Under this, and later permissive orders, approximately 400 creditors of Currie & Co. have come into and become parties to this suit, by various intervening peti-

tions, claiming ownership or interest in certain of the securities held by defendants.

While these proceedings were in progress a rising stock market developed. Owing to fluctuating prices and the uncertain value of many of the assets held by Hayden, Stone & Co. under the injunction, and as a result of conferences between counsel for defendants and complainant, it was deemed advisable to convert the assets, so held, into cash as soon as practicable. An application was made to the court for a dissolution, or modification, of the injunction, and on August 13, 1908, "counsel for defendants consenting thereto, and counsel for intervening petitioners objecting thereto," permission was granted Hayden, Stone & Co. to dispose of said stocks, bonds, and securities on the market at the most advantageous terms obtainable, keeping and reporting to the court a full record of each transaction, and the prices obtained from day to day. All surplus over and above the sum of $1,340,282.83, with interest since July 19, 1908, was to be promptly paid to the receiver and held by him intact to abide the result of this suit, subject to the further order of the court; it being also expressly provided that whatever rights and claims any of the creditors or customers of Currie & Co. had to any particular stocks, bonds, or securities should be considered transferred and attached to the moneys derived from the sale of the same.

In the meantime, bankruptcy proceedings were instituted in the United States district court for the eastern district of Michigan, which resulted in an order of said court, made on August 26, 1908, adjudicating said Currie & Co. a bankrupt, as a copartnership, and also Cameron Currie and Louis H. Case, the members of such firm, individually bankrupts. Complainant was appointed trustee in bankruptcy of said bankrupts, both as a copartnership and as individuals. The United States court in bankruptcy recognized this as an ancillary suit of which the State court had acquired jurisdiction, saying:

"The suit in question is not a mere matter of administration. Other persons than the bankrupt, namely, not only Hayden, Stone & Co., but certain intervening parties, claim ownership and the right of possession of respective securities, not only adversely to each other, but adversely to the trustee. * * * The proprieties, in my judgment, favor leaving the Wayne circuit court to determine the controversy which has been thus far under its control."

On November 27, 1908, pursuant to stipulation of counsel, the Federal court, by an order which will be considered later, authorized complainant to have himself substituted as trustee in bankruptcy instead of receiver of said Currie & Co., which was done by an order of the circuit court of Wayne county on December 7, 1908. Following this, on December 8, 1908, both complainant and defendants filed and served general answers to all petitions of intervening creditors.

Prior to June 23, 1908, Currie & Co. had accounts with, and did business through, three different brokerage houses in the East: Richardson, Hill & Co., of Boston; E. & C. Randolph, of New York; and defendants. Their general relations and manner of doing business were substantially the same with each, and were according to the methods of dealing customarily pursued by stockbrokers with each other. It was practically the same as that described in *Skiff* v. *Stoddard*, 63 Conn. 198 (26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102), and is outlined, with sufficient detail, by the trial judge, as follows:

"The voluminous proofs taken in open court and the depositions taken in New York and Boston reveal the method under which business was conducted between these two firms. For several years Currie & Co. had, on behalf of itself and its customers, made purchases of copper and other stocks and bonds in the Boston market, through Hayden, Stone & Co. The latter firm had in numerous cities customers who were trading in stocks and bonds in a manner entirely similar. Securities belonging to the firm of Currie & Co., or over which they had control, were deposited with the defendants as security for the

payment of the entire Currie & Co. account. Every item
in the account was charged against, or credited to, Cur-
rie & Co., and Hayden, Stone & Co. saw to it that at all
times they had in their possession securities that exceeded
by about 20 per cent. the amount of the Currie & Co.
indebtedness. From the very nature of things the firm
of Currie & Co. was always indebted to the defendant.
The indebtedness varied in accordance with the volume
of business done and the value of securities likewise
changed from time to time. The indebtedness was con-
sidered by both parties to the dealings as Currie & Co.'s
indebtedness, and no thought was given to the fact that
purchases and sales of securities was made for the bene-
fit or on behalf of customers of Currie & Co. It was
what had been spoken of in the proofs and arguments and
briefs as Currie & Co.'s general account for Hayden,
Stone & Co. If the customers of Currie & Co. ordered
certain shares of stock purchased, the order was wired by
Currie & Co. to Hayden, Stone & Co., without any in-
timation being given in the message as to whether the
purchases were made for Currie & Co. or for one of its
customers, and in every instance the order was executed
and possession of the stock obtained by Hayden, Stone &
Co. for Currie & Co. and in each instance H. wired C.,
'We have this day bought (or sold) for your account,' etc.
Hayden, Stone & Co. did not know or seek to know who
Currie & Co.'s customer was, or the nature or character
of the transaction between such customer and Currie &
Co.; but they considered the purchase made by Currie &
Co. and held the certificate of stock purchased in Currie
& Co.'s general account. If Currie & Co. desired the
stock forwarded so delivery could be had to their custom-
ers, and the general condition of the Currie & Co. ac-
count warranted it, the stock was forwarded; otherwise,
Hayden, Stone & Co. held the stock as collateral to the
general account, and the certificate of stock was never
forwarded until provision was made either through the
condition of the general account, or by the shipment of
funds to make full payment thereon. Each and every
such purchase was regarded by both Hayden, Stone & Co.
and Currie & Co. as a purchase on margin, as between
them, and the stock was held as security for the payment
of the balance of the full purchase price. No knowl-
edge was had or sought by Hayden, Stone & Co. as
to whether the stock was purchased for Currie & Co. or

for one of its customers, or, if the latter, whether the customer had purchased on margin or had paid Currie & Co. in full therefor."

For several months prior to June 22, 1908, defendants had been negotiating with, and endeavoring to induce, Currie & Co. to give them control of all their eastern business, at one time even intimating that, unless some arrangement was made to that end, defendants would make business connections with a rival firm in Detroit. This was finally agreed to, and on June 22, 1908, Hayden, Stone & Co. took over both the E. & C. Randolph and Richardson, Hill & Co. accounts with Currie & Co., paying those firms their respective balances against Currie & Co., which amounted to approximately a million dollars, receiving in return from them the securities held therefor. Both of those accounts were well protected, with liberal margins, by a satisfactory class of securities. Hayden testifies:

"We told Mr. Currie that if we had his New York account, which would give us good collateral as well as poor and leaven the lump, so to speak, we would be glad to give him an additional leeway on the amount of coppers that he carried."

By this proceeding Hayden, Stone & Co. acquired control of all the eastern business of Currie & Co. and became their sole eastern correspondent.

When Currie & Co. failed, and complainant was appointed receiver, the difference between their indebtedness to defendants, being in round numbers $1,340,000, and the then market value of the securities held therefor, being approximately $1,576,000, left an estimated margin of about $236,000. These securities were sold pursuant to the interlocutory order of August 13, 1908, and, under the improved condition of the market, sufficient was realized so that Hayden, Stone & Co. turned in to the receiver $324,975.13, after deducting the amount claimed to be owing themselves by Currie & Co. and for which they asserted a lien on said stocks.

The indebtedness claimed by defendants against the estate in bankruptcy is not disputed except as to two items for $4,259.02 and $3,000, respectively.

The former item was for "excess commissions charged and retained out of the proceeds of the sale of said securities under order of this court." Defendants had consented in writing to the entry of such order, which provided—

"That any and all surplus over and above the sum of $1,340,282.83 (with interest since July 18, 1908) received by said defendants, or any of them, shall be promptly paid by them to said receiver, which surplus shall be held by said receiver subject to the future order of this court."

It is virtually conceded that the position taken by the circuit judge, holding that this charge for liquidating their collateral should be reduced to actual outlay and the lowest amount chargeable by the rules of the stock exchange, is just.

The other item is for $3,000 paid to expert accountants for auditing Currie & Co.'s books in June and July, 1908, at the request of defendants. In relation to this service Mr. Hayden testifies:

"The examination was made because, although we had taken up his New York stocks, the percentage of low-priced collateral was so great we wanted to prove to ourselves that our impression that he was carrying too many low-priced stocks for Michigan people was correct. That was absolutely the only purpose for which we had that examination made."

Assuming this to be true, there is no reason, in the absence of an express agreement, why the estate of Currie & Co. should defray the expenses of defendants' proving to themselves the correctness of their impressions. The item was properly disallowed.

The undisputed evidence in this case shows that Currie & Co., as their financial condition became more desperate, resorted to doubtful and dishonest methods, in flagrant disregard of their customers' rights, and used, as col-

lateral for money borrowed of defendants, not only stocks held on margins, which they had a right to repledge to the amount owing them thereon, but also stocks left with them in trust for safe-keeping and for transfer, and stocks fully paid for but withheld from delivery. It is out of such unlawful proceedings that this tangle of litigation has arisen.

It is the claim of defendants that they made advances on the stock, which was taken as collateral, in good faith, in the usual course of business, believing it was stock which Currie & Co. could lawfully hypothecate, and with no notice, actual or constructive, of any dishonesty, or knowledge that it was stock of others which they had no right to pledge.                                              •

It is a well-settled and unquestioned general rule that a broker has a lien upon all stocks purchased by him, for a customer, for all unpaid balance of the purchase price.

Though there are cases expressing a different view, we think it established by the great weight of authority that the customer buying on margin becomes owner of the stock, although the broker who has purchased it for him can hold it as a pledge for advances made in obtaining it. If the stock so purchased becomes thereafter worth more or less than the purchase price, the gain or loss is that of the customer, who is also entitled to credit for any dividends which may accrue thereon. The relation of the parties is pledgor and pledgee; the broker's ultimate rights in the stock being limited to the money he had advanced to purchase the same, with interest, and his commissions for transacting the business, in which he is protected by the partial payment the customer has made and the stock which he holds in pledge. *Markham* v. *Jaudon*, 41 N. Y. 235; *Skiff* v. *Stoddard*, 63 Conn. 198 (26 Atl. 874, 28 Atl. 104, 21 L. R. A. 102); *Content* v. *Banner*, 184 N. Y. 121 (76 N. E. 913, 6 Am. & Eng. Ann. Cas. 106); *Richardson* v. *Shaw*, 209 U. S. 365 (28 Sup. Ct. 512, 14 Am. & Eng. Ann. Cas. 981, and cases there cited).

A "pledge" is something more than a simple lien. It s a deposit or delivery of possession and control of prop-

erty, made as security for debt, vesting a right to the
property in the pledgee to the full extent necessary to pro
tect and collect the debt.

The evidence shows that the various certificates of stock
held as security by defendants were so indorsed, dated,
witnessed, and guaranteed as to be negotiable in form
and transferable by delivery. While certificates of stock
are not, strictly speaking, commercial or negotiable paper
under the law merchant, like promissory notes or bills of
exchange, yet the recognized usage of indorsing such cer-
tificates in blank and so transferring title, to them and
what they represent, by delivery has given them a *quasi*
negotiable character to such an extent that they are often
held, as they pass from hand to hand, free from undis-
closed antecedent equities.

That Currie & Co. had the right to subpledge and bor-
row money on margined stock, which they held from sep-
arate customers, *en bloc,* commingled and delivered fo
the purpose of obtaining capital required to carry thei
customers' purchases, is borne out by a strong line o
authority. The subject is ably and exhaustively reviewed .
in *Skiff* v. *Stoddard, suprà,* a leading case upon the sub-
ject. This case is recognized as authority and quoted at
length in Dos Passos on Stock Brokers and Stock Ex-
change (2d Ed.), p. 286. It is also favorably referred to
by the Supreme Court of the United States in *Richard-
son* v. *Shaw, supra,* and in numerous other decisions of
various jurisdictions.

In *Wahl* v. *Tracy,* 139 Wis. 668 (121 N. W. 660), it
is stated as settled law that in case a stockbroker buys
stocks on margin, through another broker, for a cus-
tomer, the customer acquires no right, by reason of the
margin he has paid and the order he has given, to posses-
sion of the stock; but the broker can retain it in his own
name, unidentified and unseparated from others until
the balance of the purchase price is paid. That, accord-
ing to recognized customs of the stock exchange in which
the dealing was had, he may repledge this stock *en bloc*

with other stock held by him, to the broker through whom he purchased, and, if the broker through whom the customer dealt becomes insolvent, the customer cannot compel delivery of the stock by the second broker or sub-pledgee, on the strength of having paid the insolvent broker in full for the stock, but must settle according to the lien of the second broker. This necessarily assumes that the second broker acted honestly and innocently, in good faith, in the regular course of business, with no knowledge or notice, actual or constructive, that the first broker was infringing on the rights of customers in re-pledging such stocks.

As between Currie & Co. and their customers, it was the duty of the former to always have available, and be prepared to deliver, stock of the kind and quantity purchased by the customer whenever full payment for same was made.

For Currie & Co. to pledge stock in their hands fully paid for, left with them for transfer, or for safe-keeping, was without color of right, fraudulent, and criminal.

Between the customers and defendants, however, each of whom were dealing with and trusting Currie & Co., the questions of good faith and equitable estoppel arise.

The principle involved is thus stated in Colebrooke on Collateral Securities, § 320, p. 549:

"The pledgee of stock certificates, indorsed in blank, holding the legal title and apparent ownership, may confer upon a subpledgee advancing value upon the credit of such title and apparent ownership, in good faith, and without notice of equities, a more extended right, as against the owner and pledgor, than he himself has. The presumption arises in favor of third persons advancing money in good faith and without notice that one in possession of certificates of stock indorsed in blank is the owner thereof, a holder for value, with a good title. The act of sub-pledge, by a pledgee, holding the title and possession, for a loan greater in amount than the principal debt, is unauthorized and fraudulent as between the parties to the original contract of pledge; but as against the innocent sub-pledgee for value, without notice, the owner is estopped to

set up any defenses or equities. Having enabled the fraud and deceit to be practiced, by his misplaced confidence in allowing the pledgee to appear as the owner of certificates of stock, indorsed in blank, the pledgor must bear the loss."

See, also, *Duncan* v. *Jaudon*, 15 Wall. (U. S.) 165; *O'Neil* v. *Mining Co.*, 174 Fed. 527, 98 C. C. A. 309, (27 L. R. A. [N. S.] 200); *Wood* v. *Smith*, 92 Pa. 379–390; *Ryman* v. *Gerlach*, 153 Pa. 197 (25 Atl. 1031, 26 Atl. 302); *Prall* v. *Tilt*, 28 N. J. Eq. 479.

In *McNeil* v. *Tenth Nat. Bank*, 46 N. Y. 325 (7 Am. Rep. 341), it was said:

"Where the true owner holds out another, or allows him to appear as the owner of, or as having full power of disposition over, the property, and innocent third parties are thus led into dealing with such apparent owner, they will be protected. Their rights in such cases do not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power, which, through neglect or mistaken confidence, he caused or allowed to appear to be vested in the party making the conveyance."

The securities found in the hands of defendants were of several classes, a portion of them, by the terms under which they were intrusted to Currie & Co., not being actively within the scope of stock brokerage transactions, though it might properly be said that the fact they were stockbrokers accounted for the possession, the owners either then being, or some time having been, customers.

It is urged that the stocks not tinctured by a margin transaction are not affected by the relationship of brokers, either as creditor or pledgee, but involve only the ordinary functions of principal and agent. While, in certain aspects of the case, these distinctions are of importance, the issues of good faith and equitable estoppel are not contingent on a classification of the securities or a comparison of the relative rights of Currie & Co. and their customers between themselves.

All stocks held as security by defendants were acquired in the general course of business, taken from Currie & Co. in pledge for value, either by purchase on the stock exchange in filling orders, or forwarded from Detroit, or received from the two eastern firms in taking over Currie & Co.'s accounts. They were all indorsed in blank and properly certified so as to be negotiable in the usual course of trade. The customers and owners, by intrusting their stocks so indorsed to Currie & Co., either by delivery, or by authorizing their purchase for them through those channels of trade, invested Currie & Co., their brokers, who were dealing with the public in that special line, with the *indicia* of ownership, thus putting into the hands of such brokers power to appear as the true owner and perpetrate the frauds complained of. We think that, under the authorities referred to, the owner is estopped from asserting paramount interest against an innocent purchaser, or an innocent pledgee, who has acquired the stock in the usual course of trade for value, without notice and in good faith.

"Good faith" is defined in 8 Am. & Eng. Enc. Law (1st Ed.), p. 841, as follows:

"To constitute good faith, there must be an absence, not alone of participation in the fraud or collusion with the vendee, but also of knowledge or even notice of the fraud, or of facts and circumstances calculated to put an ordinarily prudent business man on inquiry, so that he would ascertain the truth."

This definition is quoted and approved by this court in *Pinkerton Bros. Co.* v. *Bromley,* 119 Mich. 8 (77 N. W. 307).

It therefore becomes of paramount importance, on this branch of the case, to determine whether defendants had any knowledge or notice of the breaches of trust and frauds perpetrated by Currie & Co. on their customers, or of facts and circumstances calculated to put an ordinarily prudent business man on inquiry so that he would ascer-

tain the truth, and, if so, to what extent and at what time did such notice or knowledge come to them ?

It must be conceded they had conclusive knowledge and notice on July 13, 1908, when the experts they had put on Currie & Co.'s books reported.

The trial court finds such knowledge imputable to defendants on June 23, 1908, when previous knowledge of various delinquencies culminated in opportunity to study the accounts purchased from the other eastern brokers, and they sent an agent to Detroit for the purpose, as defendants claimed, of establishing a margin system and determining if Currie & Co. "were allowing their customers to carry more low-priced stock than they should."

While recognizing the rule that equitable estoppel may be successfully invoked by an innocent subpledgee against the owner for a loan greater in amount than the original debt, and unauthorized as between the original parties, nevertheless it should be borne in mind that in determining the question of good faith all surrounding circumstances, including the relations of the parties, and facts necessarily known in that connection, are to be considered.

Defendants, as brokers dealing with brokers, well knew and understood that Currie & Co. were, like themselves, in an agency avocation, buying and selling for customers and owners generally, on commission, even though they did not know who the customers were. They knew that the legitimate loans for such business represented margins, and that the greater part, at least, of the securities deposited with them by Currie & Co., were primarily the property of customers, and the right to repledge them was limited to the unpaid balance due on them. In the regular course of business, dealing with a reputable, and presumably honest, brokerage firm, they had the right to assume, in the absence of anything to the contrary, that the securities were lawfully repledged; but, when proof is offered that irregularities and questionable practices came to their knowledge, their good faith is to be tested in the light of all they knew, including the fact that others be-

sides Currie & Co. were owners of, or interested in, much of the collateral they relied on,

"If there is anything likely to put a reasonable business man upon his guard as to the authority of the agent, it is the duty of the third party to inquire how far the agent's acts are in pursuance of the principal's limitations." *Hurley* v. *Watson*, 68 Mich. 531 (36 N. W. 726).

And this is an equally proper rule of constructive notice where the third party is a subpledgee and the agent is a broker dealing with and through him.

The nature and extent of the business relations between defendants and Currie & Co. are shown by books and records produced for a year prior to the failure, going back to July, 1907. Currie & Co. are shown to have been hopelessly insolvent at that time, though, apparently, then unknown, even to themselves. There is nothing in the proofs to indicate that their responsibility and integrity were then questioned, or to suggest defendants had any reason to suspect them. They were doing the largest brokerage business in the city of Detroit, bore a good reputation, and were generally regarded as trustworthy and financially sound. Defendants had been doing business with them satisfactorily for several years and were desirous to retain and increase their patronage. To what extent, if at all, Currie & Co. had indulged in questionable methods before that time, is not shown; but during the financial depression which occurred in the latter part of 1907 they were in sore straits and resorted to irregular and dishonest practices, which were followed, when emergencies arose, until their failure. They concealed and covered up their true condition by fraudulently hypothecating securities under their control, delaying delivery by specious excuses—by a system of having commercial paper afloat called "kiting paper," making overdrafts and wiring money at the last moment to cover them, and other similar expedients. They retained the confidence of most of their customers and the general public until the last,

and their failure is claimed to have been a great surprise to all. It manifestly was to many.

Many hundreds of pages of the voluminous record in this case are devoted to details of the business done with defendants and others by Currie & Co. during the year preceding their failure. It is an instructive chapter in frenzied finance, of various degrees, from many angles. Able counsel on both sides have patiently and intelligently delved through the tedious mass of names and figures and set out in their briefs the helpful results, in items, condensed tabulations, and summaries, upon which they rely in support of their deductions. It is shown that the business done during the year ran into thousands of transactions and millions of dollars. In the line of so-called accommodation drafts alone, Currie & Co. drew on their eastern brokers for over $8,500,000. These drafts would be put into their Detroit bank and placed to their credit. When later forwarded for collection and presented to the eastern brokers on whom they were drawn, they would be met, either by money wired from Detroit by Currie & Co., or the eastern brokers would cover them by drawing in return on Currie & Co. Over $2,280,000 of these accommodation drafts were drawn on defendants and cared for in this manner. It is claimed that this was, in effect, what is known as "kiting paper," a questionable method resorted to in financial emergencies which amounted to constructive notice to defendants that Currie & Co. were *in extremis.*

As of like import it is shown that after April 1, 1908, 27 drafts, aggregating $266,746.38, drawn by Currie & Co. on defendants, were dishonored and went to protest; the protest fees amounting to approximately $150. These were all subsequently paid or satisfactorily adjusted.

Between October 1, 1907, and May 16, 1908, owing, it is said, to the financial depression which befell the country, defendants insisted that purchases made by them on orders of Currie & Co., as well as others, should be fully paid for, instead of holding the stock bought and charg-

ing the price against the account of Currie & Co., as had formerly been the practice. Thereafter, in pursuance of such policy, stocks purchased on order of Currie & Co. by defendants were attached to drafts for the purchase price and sent through the banks for delivery and collection. When they reached Detroit, it was incumbent on Currie & Co. to meet the drafts in order to get the stocks. In a large number of instances, instead of retaining the stocks to be delivered to the customers who had ordered and paid for them, they would forthwith attach the same to drafts drawn by them on defendants, put them in the bank for collection, receive credit for them on their account, and start them back to Boston again, where they would be taken up by defendants and held as collateral against Currie & Co.'s account. The securities swung around the circle in this manner aggregated approximately $450,000. Defendants are also shown to have received two letters from different customers of Currie & Co., complaining of tedious delays and inability to get delivery of stock they had purchased and paid for on reports that the same had been bought by them through defendants, and asking for information. These were answered to the effect it was a matter between the customer and Currie & Co.

It is further pointed out that the unusual manner of doing business between the two firms involved extra expense to Currie & Co., which would naturally be a matter of suspicion. The exchange alone on the drafts for $2,718,064.47 drawn by defendants on Currie & Co., from July 1, 1907, until the failure, amounted to $2,729.88. The exchange on drafts drawn by Currie & Co. on defendants would be much more; near $2,000,000 wired defendants by Currie & Co. involved an extra expense of 50 cents for $1,000. It is claimed that these and other extras amounted, during the year, to approximately $7,500.

It also appears that the voluminous correspondence between the parties during the year have, scattered through

them, numerous complaints, criticisms, demands, and even threats, indicating that the methods of Currie & Co. were irregular, dilatory, and unsatisfactory to defendants in many ways, though their interest was only directed to maintaining a safe margin on the securities they received. On April 2, 1908, defendants wired Currie & Co. in part:

·"This is final and drafts will go to protest unless you get $39,500 here before three. This means 2 o'clock and not tomorrow morning."

On April 27th defendants wired a charge for protest fees on six drafts. Notices of like charges were also wired on May 9th, May 14th, and June 13th. It is also argued from the testimony that defendants knew of similar irregularities with the other eastern brokers.

All these various matters are reviewed and explained, in the light of testimony referred to, by counsel for defendants in forceful and logical arguments leading strongly to the view that, as between defendants and Currie & Co., the conduct of defendants was safe and sane from a broker's standpoint, and that from no particular one of these alleged questionable transactions, discussed and considered separately, would a court feel justified in imputing to defendants constructive notice of the dishonesty or insolvency of Currie & Co. A single failure to keep up margins, to make remittances when promised, to promptly deliver a customer's stock, the drawing of a single accommodation draft, or even allowing the same to go to protest, in the volume of business done, would not necessarily be held constructive notice of dishonesty or insolvency. The test is to be applied to these irregularities and delinquencies cumulatively, not separately. When unbusinesslike and questionable methods, though denounced and reprimanded and at times forbidden, are known and allowed to increase and become chronic, there comes a time when the party knowing these things, and knowing also that others are interested in the securities being hypothecated, still continuing to deal

with, and take chances on, one practicing them, ceases to be acting innocently and in good faith.

It is contended in behalf of the defense that, owing to the magnitude of their business and the number of transactions daily passing through their records, it is impossible for them to note in detail the nature and relevancy of each; that in their great volume of business these things were not noticed or noticeable; that they had about 3,000 accounts and were doing a business amounting to approximately $1,000,000 per day with, frequently, as high as 500 deliveries of stocks entered on their books in a single day, and therefore they could not and were not bound to observe by comparison that many certificates forwarded to Currie & Co. were immediately returned. While this is but one of the several things imputed as notice, we do not conceive that the magnitude of defendants' business should have great bearing in aid of an equitable estoppel; the basic law of business should be the same everywhere, whether the transactions are few or many, great or small.

"To allow the usages of Wall street to control the general law in relation to any matter might result in the establishment of principles not always in accordance with sound morals. I prefer that legal principles should have a universal application, and that contracts should receive the same interpretation in the thronged and busy mart of our commercial metropolis that they do elsewhere." *Dykers* v. *Allen*, 7 Hill (N. Y.), 497 (42 Am. Dec. 87).

The attitude of defendants, and evidently their belief, was that if Currie & Co. kept their margin good by collateral, no matter where or how it was obtained or what knowledge defendants had upon that subject, actual or constructive, they were protected.

Charles Hayden, senior member of the firm, testifies in part as follows:

"The only thing we know is our own business; that is, that as long as his margin is within the limit of safety we are protected. * * * Well, you must know I have got something more to do than to give my attention to what the other fellows are proposing to do. The only

thing I know is that Mr. Currie had an account here which was properly margined.   *   *   *   So long as he was drawing on us and getting his money by telegraph here in season we didn't care how long the practice ran on. *   *   *   I can't jack up every man.   *   *   *   We stood in that relation to Currie in this business, the relation a man stands to a boy, in the relation of a big boy to a small boy; the same relation that a little boy might take to a dog—the position of a master to a dog.   If you are going to get a commission on it, you are naturally going to get as big a margin as you can; if you don't get all you would like, you get as much as you can."

Counsel for defendants strenuously urge it as unthinkable that they would take over the accounts of E. & C. Randolph and Richardson, Hill & Co., advancing almost $1,-000,000 thereon, as well as $80,000 more to Currie & Co., if they had any reason to suspect Currie & Co. dishonest and insolvent.   The trial court was impressed by this contention, and adopted the view that all transactions prior to June 23, 1908, were in legal good faith, at which time "things changed."   Defendants, then having "opportunity to study the accounts purchased," received a letter from Cameron Currie, with a financial statement containing the expression "shorts against doubtful accounts," and at once sent their agent to Detroit ostensibly "to establish a margin system" and determine if Currie & Co. "were allowing their customers to carry more low-priced stock than they should."   Events on or about that day are disclosed which may well be regarded as the culmination of evidential events which went before, sufficient to justify the court in fixing that as a definite date when knowledge may be imputed to defendants adequate to remove their dealings with Currie & Co. from the defense of good-faith transactions.   If nothing irregular or doubtful had previously come to defendant's knowledge, the events of that day, standing alone, might not be sufficient to substantiate the court's conclusions; but it is the many and repeated irregularities known to defendants, already referred to, great and small, extending throughout the

year, supplemented by what occurred at that time, considered collectively, which justify the conclusion that they could then, if not before, be no longer regarded as innocent parties, the events of that day making more certain what previous events tended to prove. Just what defendants actually did know or suspect is not the question, but whether such facts and circumstances were known by them as fairly imputed such knowledge to them.

We do not think it follows from the fact defendants purchased the accounts of the other eastern brokers that they had no knowledge or suspicion of Currie & Co.'s insolvency. It is manifest they thought and believed that they were protected, whatever happened. They believed the securities taken over averaged better than their own and would, in the language of Hayden, "leaven the lump, so to speak." It was in their line of business, and not a gigantic undertaking for them. They tell us Currie & Co., by comparison with them, were as a boy to a man. Their testimony shows they were doing a business, at that time, of over $1,000,000 a day, had 25 or 30 correspondents with whom they bore similar relations to those with Currie & Co., carried 3,000 accounts, made as high as 500 deliveries of stock in a day, were loaning customers in round numbers $20,000,000, protected by securities they held worth between $25,000,000 and $30,000,000. The Detroit business was desired by them. They had been trying to get control of it for some time. By making this purchase they strengthened their securities as a whole, acquired undivided control of Currie & Co., and, with such large indebtedness to them, could absolutely dictate. They believed themselves amply secured and safe in either contingency. If Currie & Co. failed, they would be in control, on the ground, in possession of the assets, ready to handle the liquidation and go on with the business in their own name. It could well be urged as a desirable business proposition from either standpoint. Following the purchase, when they spoke Currie & Co. promptly lay down. *Rigor mortis* had scarcely set in

with their defunct predecessor before they took full possession of the offices and opened a brokerage business in their own name.

Counsel for defendants say:

"It could not be expected that Hayden, Stone & Co. should suspect Currie & Co. of doing something unlawful and criminal when evidently not one of the 400 interveners here on the ground had any such suspicion."

While these interveners were on the ground, they were not on the inside. Had they known what defendants knew, it can safely be said they either would not have been customers, or would have been equally insistent on being secured with a good margin.

We are not agreed that the learned circuit judge should have selected an earlier date; we are convinced he should not have selected a later date. His action in that particular is sustained.

As a result of such finding, the trial court held—

"That on and after the 23d day of June, 1908, the said defendants were chargeable with knowledge of said insolvency and of all the rights and equities of the interveners in this cause to the stock and securities which were, on and after said 23d day of June, 1908, in defendants' possession, but that in all cases where the defendants had purchased and paid for securities on the order of said Currie & Co. subsequent to said 23d day of June, 1908, they were entitled to hold such securities until paid in full therefor."

We are unable to sustain the limit of liability so specified. After June 23, 1908, when defendants ceased to be innocent parties dealing in good faith, and became chargeable with knowledge of the rights and equities of customers of Currie & Co., whose orders were executed through them, it became a matter of simple agency, unprotected by either equitable estoppel, the law of brokerage, or the usages and customs of the stock exchange. This is the corollary of the conclusions previously reached. After that date, if not before, defendants and Currie & Co.

were, in the graphic language of Hayden, "playing the game together." He testifies:

"We stood in that relation to Currie in this business, the relation a man stands to a boy—the position of a master to a dog."

The master of a dog is generally held accountable for its depredations and responsible for the lambs it kills. Defendants then had it in their power to control and dictate to Currie & Co., and terminate the impositions they were practicing on their customers. They continued to co-operate with, assist, and encourage them to continue their business, with its impositions on the public, as before, and to gamble on the strength of securities which they knew did not belong to them. Without their co-operation and support, Currie & Co. could not have continued. But, indifferent to the consequences to others so long as their margins were kept good and business was coming in, they retained and strengthened their former relations with Currie & Co. and kept them afloat, though insolvent, in position to further insnare innocent customers, thus, by indirection we may concede, participating in the impositions and delinquencies complained of, as joint tort-feasors. They must be held to the same accountability as Currie & Co. in all transactions after June 23, 1908, in which they participated as agents of Currie & Co. in buying, selling, or receiving as collateral, stocks and securities of interveners, where ownership can be traced. In that particular the decree of the trial court must be modified and a personal decree entered against defendants, the same as could be entered against Currie & Co. in relation to such transactions.

As before stated, the stocks and securities have been sold by order of the court, from the proceeds of which defendants retained the amount of their claim against Currie & Co.; the surplus being paid to complainant to be held abiding the result of this suit. In passing upon this, the trial court found that defendants were not entitled to

retain from such proceeds certain items, amounting to $90,104.02, covering various transactions subsequent to June 22, 1908, and rendered against defendants a personal decree therefor.    To this should be added whatever amounts interveners are found entitled to on the basis of their rights and equities with Currie & Co. arising from dealings subsequent to June 22, 1908, in which defendants in any way participated, and in which ownership can be traced, as heretofore stated, working out the several transactions in accordance with the individual ownership and contracts of agency.

The testimony offered in behalf of the many interveners is stated to have comprised six volumes embracing 2,497 typewritten pages.   In order to avoid further expansion of the four-volume edition of the record now before us, covering the main case, it was stipulated, among other things, that, exclusive of the interveners in whose behalf testimony appears at length in the printed record, the evidence given in support of the several petitions of the interveners tended to sustain the finding of ownership of each intervener of the particular stocks and other securities, with the value thereof, the classification of said interveners, and the order and several amounts of distribution of the proceeds remaining from the sale of said stocks and securities, · as set forth in the decree of the trial court, subject to and after satisfying the prior lien as therein found of Hayden, Stone & Co.

The property having been sold, the proceeds of the sale take the place of the property, ultimately to be disbursed according to the interests of the respective claimants in said property; the court, in authorizing the sale, especially and properly providing that whatever rights creditors had to any particular security so sold should attach to moneys derived from such sale.

This rule should be applied, and the same course pursued, with any funds which may be added to those now in the hands of complainant resulting from any further
171 MICH.—5.

liability of defendants which may be found, based on their responsibility for Currie & Co.'s delinquencies after June 22, 1908.

It is urged in behalf of certain interveners that the peculiar facts in their several cases show special equities and legal rights not applicable to others, entitling them to personal decrees against defendants. The testimony and briefs in each of those cases have been read and considered by the court. To separately discuss them would extend this opinion to an interminable length and is not thought essential to a proper disposition of the case at this time. Under the pleadings and proofs, we think the decree as to all conflicting claims should be, primarily, between complainant and defendants, the funds realized to be kept intact in the hands of complainant, under control of the court, to be ultimately disbursed to interveners by judicial direction, in accordance with their respective interests and ownership of the assets from which they are derived.

So far as the printed record furnishes data therefor, the classification and apportionment made by the trial court is sustained, except as it becomes necessary to modify the same as heretofore stated. As the six volumes of testimony especially relating to the 400 interveners is not embodied in the printed record, and the relation of all transactions to said June 23, 1908, is not satisfactorily shown, the case will be remanded to the trial court, to readjust the classification and apportionment accordingly.

Counsel for certain interveners question the jurisdiction of the State court to proceed further with this suit after Currie & Co. were adjudicated bankrupts by the United States court in bankruptcy, while others contend that the jurisdiction is so limited and defined by the order of the Federal court directing the trustee in bankruptcy to be substituted herein as to preclude the State court from determining defendants' lien upon any stocks or securities in their hands belonging to interveners, or from allowing compensation to complainant and his counsel for services.

We are not unmindful of the numerous authorities on that subject and the general rule as to jurisdiction in such cases. The record shows that this question in different forms was twice raised before the Federal court, which declined to then assume jurisdiction of this suit—once before and once after decree. In the latter case it was stated by United States District Judge Denison (*In re Currie,* 197 Fed. 1012):

"The entire adversary conflict with Hayden, Stone & Co., is in that court, and every question there arising should be decided without embarrassment, or suggestion of embarrassment, from anything which I have said in the foregoing memorandum."

In authorizing the trustee in bankruptcy to be substituted for the receiver and proceed with this suit, United States District Judge Knappen limited the proceeding to,—

"Adverse claims by way of ownership of the various securities involved in said suit (or in lieu thereof to proceeds derived from the sale of such securities, respectively * * *); it being deemed proper that the administration of the estate of the bankrupts and all questions of preference, priority, or security other than those based on ownership, as aforesaid, should be had and determined in this bankruptcy court; * * * also, that the claims of Hayden, Stone & Co. referred to * * * shall be limited to such as pertain to their rights as pledgees of said stock or as owners thereof."

It was further ordered that said—

"Trustee in bankruptcy is entitled to receive from said receiver immediately and unconditionally the general funds and property that have been held by said receiver and which are *not* involved in said suit in chancery."

So far as the rulings of the Federal court are concerned, this court has no authority or disposition to review them. If the parties to whom they were adverse were dissatisfied, they should appeal for review to the proper tribunal. As that court held, "this suit is not a mere matter of administration." It does not relate to the adminis-

tration of the bankrupt's estate legally in the bankruptcy court. Possession was only ordered taken of funds and property "not involved in said suit in chancery." This suit was instituted to determine adverse claims of ownership of property primarily in the custody of this court, incident to which were the rights of defendants as pledgees. Having already acquired jurisdiction of litigation in regard to property in its custody, a State court is not necessarily divested of jurisdiction in relation thereto by bankruptcy proceedings. *Frazier* v. *Trust Co.*, 99 Fed. 707 (40 C. C. A. 76); *Pickens* v. *Dent,* 106 Fed. 653, 45 C. C. A. 522. This case, as presented in the State court, is that of a receiver seeking to secure from defendants, and conserve for the estate and its creditors according to their respective rights, assets based on ownership. Incidental thereto are the power and duty of the court to impose on the funds secured the necessary and reasonable expenses which inevitably follow.

In view of the magnitude and extent of this litigation, the expenses awarded by the trial judge are not found to be excessive, and his action in charging them *pro rata* against the fund realized from the stocks and securities, the ownership of which was involved, is sustained by authority of *Preston Nat. Bank* v. *Purifier Co.*, 102 Mich. 462 (60 N. W. 981), wherein it is said:

"The expense incurred in collecting has been done under the express decree of this court, and it is inequitable that the receivers should go without compensation, or that they should be paid out of funds which should go to unsecured creditors."

We conceive it the duty of this court to dispose of the case in the usual manner upon the pleadings and proofs presented in this particular suit by the appeal taken, with no thought to review, influence, or conflict with the course of proceedings in the bankruptcy court.

The conclusions of the learned circuit judge upon the several questions involved are hereby sustained, with the modification heretofore suggested, and the case is re-

manded for further proceedings to comply therewith. Complainant will recover from defendants his costs herein, to be taxed.

MOORE, C. J., and MCALVAY, BROOKE, STONE, and OSTRANDER, JJ., concurred. BLAIR and BIRD, JJ., did not sit.