[Civ. No. 3178.    Third Appellate District.—January 6, 1927.]

P. B. BENNETT, Appellant, v. LOGAN & BRYAN (a Copartnership) et al., Respondents.

[1] PLEDGES — STOCK BROKERS — CONTRACTS — RULES OF EXCHANGE — INDEBTEDNESS.—A customer of a local stock brokerage firm who delivered to the latter certain Liberty bonds as security for future marginal purchases by him, and who knew that the bonds had been sent by the local firm to an eastern stock brokerage firm, through which the local firm executed orders for the purchase of securities

---

1. Rights between customer and subpledgee to whom customer's securities are repledged by broker, note, 24 **A. L. R.** 469. See, also, **4 R. C. L.** 268.

subject to the regulations and customs of an eastern exchange, and who was familiar with the customary manner of handling such transactions, is in no position to claim reimbursement from the eastern firm which, according to the custom of the exchange and to the understanding between the two firms, held all securities to secure the general indebtedness of the local firm, even though at the time of the customer's delivery of the bonds he was not indebted to the local firm.

[2] ID.—POSSESSION—TITLE—ESTOPPEL.—One who has allowed another to assume the apparent ownership of property for the purpose of making any transfer of it cannot set up his own title to defeat a pledge of the property, made by the other, to a pledgee who received the property in good faith, in the ordinary course of business, and for value.

[3] ID.—ACCOUNTS BETWEEN BROKERS—HOLDING OF SECURITIES—PAYMENT.—Where on the credit of bonds deposited by a customer of the local stock brokerage firm certain securities were purchased, and such bonds were sold for more than the amount of his indebtedness, and thereafter his account stood credited with the excess in cash and securities purchased for him, without any indebtedness to the local firm, such securities, as between the eastern stock brokerage firm and said customer, were not in a more favorable position than other securities for which full payment had not been made, since the securities in question had been repledged to the eastern firm to secure the entire indebtedness of the local firm to the eastern firm, and the relation between each of these marginal customers and the local firm was that of pledgor and pledgee, and the local firm had the implied consent of such customers lawfully to repledge the same.

[4] ID.— RULES, REGULATIONS AND CUSTOMS OF STOCK EXCHANGE — CONTRACTS.—Since each customer of the local stock brokerage firm ordered the securities to be purchased "subject to the rules, regulations and customs of the exchange in which this order is executed," such rules, regulations, and customs thereby became special terms of the contract.

[5] ID.—REPLEDGE OF SECURITIES—BANKRUPTCY OF LOCAL FIRM—LIABILITY OF EASTERN FIRM.—The eastern stock brokerage firm was not liable to customers of the local stock brokerage firm, which became bankrupt, where the latter had the right lawfully to repledge the securities purchased for its customers, and the eastern firm did not know, or have the means of knowing, that the indebtedness of the local firm to its customers was more than the

2. See 21 Cal. Jur. 299; 21 R. C. L. 638.

3. Right of broker to repledge customer's securities, note, 24 A. L. R. 452. See, also, 4 Cal. Jur. 642; 4 R. C. L. 267.

total indebtedness due to it from its customers, and the purchases for which unlawful repledges were given were made "in precisely the manner and way" as purchases for the customers of the local firm.

[6] ID.—FRAUD—CONTRACTS.—Fraud cannot be based upon the fact that the eastern stock brokerage firm, in good faith, handled the transactions of the local firm in accordance with the rules, regulations, and customs which the customers made terms of their contracts of purchase.

[7] ID.—TRANSFER OF SECURITIES—CONSENT OF CUSTOMERS.—The eastern stock brokerage firm had the right to hold the securities of customers of a firm which sold its business to the local stock brokerage firm, where all of the securities purchased on order of the selling firm were "with the consent of the purchasers" transferred to the account of the local stock brokerage firm and were held by the eastern firm to secure the entire account of the local firm.

---

(1) 9 C. J., p. 530, n. 75, p. 545, n. 1.     (2) 21 C. J., p. 1176, n. 7. (3) 9 C. J., p. 545, n. 97 New.     (4) 9 C. J., p. 530, n. 75.     (5) 9 C. J., p. 545, n. 97 New.     (6) 9 C. J., p. 530, n. 75.     (7) 9 C. J., p. 545, n. 97 New.

APPEAL from a judgment of the Superior Court of Los Angeles County. Ralph H. Clock, Judge. Affirmed.

The facts are stated in the opinion of the court.

Will J. Thayer for Appellant

Gibson, Dunn & Crutcher, Norman S. Sterry and Homer D. Crotty for Respondents.

FINCH, P. J.—Logan & Bryan are stock brokers holding membership in the New York Stock Exchange and having offices in New York City and elsewhere. For some time prior to October, 1919, George G. Prentice conducted business as a stock broker in San Diego under the name of Prentice & Company. As such broker he purchased from Logan & Bryan for his customers certain securities, which were thereafter held by Logan & Bryan as security for the general indebtedness of Prentice & Company. At the time mentioned "the business of Prentice & Company was purchased by Mason & Owen, who thereafter, until the time of their failure, carried on a general brokerage business in said city of San Diego." All of such securities purchased on

the order of Prentice & Company were "with the consent of the purchasers, transferred to the account of Mason & Owen upon or shortly after Mason & Owen purchased the business and good will of Prentice & Company, and . . . were held by Logan & Bryan to secure the entire account of Mason & Owen." Neither Prentice & Company nor Mason & Owen were members of any stock exchange. Other securities were purchased by Mason & Owen, for their customers, from Logan & Bryan and were held by the latter firm as security for the general indebtedness of the former. Each and all of the securities were purchased upon a written order to either Mason & Owen or Prentice & Company, as the case was, containing the following written direction:

"Subject to the rules, regulations and customs of the exchange in which this order is executed, and any rules, regulations and requirements of its board of directors, and all amendments that may be made thereto, buy for my account and risk (name of security)."

"All of the securities involved in this litigation were purchased by Logan & Bryan upon the New York Stock Exchange," and the purchasers knew that they were to be so purchased. The parties stipulated at the trial as follows:

"That at all times mentioned in the complaint it was and is, and for a great number of years has been, a general custom of the New York Stock Exchange, the Chicago Board of Trade, and of all markets on which Logan & Bryan had any transactions for the account of Mason & Owen, and of all of the Boards of Trade and Exchanges throughout the United States, and generally of the brokerage business throughout the United States, that if a broker who is a non-member of the board or exchange, desires to trade in commodities dealt with on such board or exchange, that the broker must execute all orders of his customers through a member of the board or exchange, and the order of such non-member broker did not show the individual customers, or for whose benefit any order to sell or purchase a security or a commodity was given, and that the board member carried all orders placed by the non-member broker to the account of the non-member broker and would charge all liability incurred in executing the orders of such non-member broker to said non-member broker, and would credit said non-member broker with all assets derived from

the execution of his orders, including all dividends and in-terest paid on the securities purchased on the order of the non-member broker, and would hold all securities purchased and or pledged by such non-member broker to secure the entire indebtedness of such non-member broker, including all advances made by such board member and commissions earned by him in executing the orders of such non-member broker until all contracts made by such non-member broker through the board member should be justly executed or closed, and that all members of the New York Stock Exchange, before accepting an account from a non-member broker, required a contract from such broker substantially the same as Exhibit D of defendants' answer."

"Before any orders were given by Mason & Owen to Logan & Bryan . . . Mason & Owen executed and delivered to Logan & Bryan" the following written instrument, referred to in the stipulation as exhibit "D":

"Logan & Bryan,
    "42 Broadway,
        "N. Y. City.

"Gentlemen: I hereby consent:

"*First*, That all transactions heretofore or hereafter made by you for my account are subject to the rules, regulations and customs of the New York Stock Exchange and its Clearing House, or the rules, regulations and customs of the Exchange or market upon which any transaction by my order is made for my account.

"*Second*, That all securities, evidences of indebtedness or other property now or hereafter carried in my account or deposited to protect the same, may be loaned or pledged by you, either separately or together with other securities belonging to others, either for the sum due thereon or for a greater sum; that said securities, evidences of indebtedness or other property may be transferred to your own account on the books of the corporation, may be sold by you, either in whole or in part, without notice to the undersigned, at any time when in your judgment the margin of protection in my account shall become impaired to a point where you deem it unsafe to carry it longer, such sale to be made at public, brokers' board or private sale, less the brokerage or other expense of said sale, to be placed to the credit of the under-signed as an offset against the debit in my account.

"Furthermore you shall not be required to return to me the identical bonds or other securities deposited by me or carried in my account, it being understood that bonds or securities of like kind can be returned to me. It is the purpose of this letter and consent to give to you, and I hereby expressly give, the consent provided for in Section 956, Subdivision 2, of the Penal Code, as added by Chapter 500 of the Laws of 1913.

"Very truly yours,

"Mason and Owen

"By Wm. McD Owen

"Dated Dec 2, 1919

"In the presence of

"A A Allen"

Section 956 of the Penal Code of New York, referred to in the foregoing instrument, provides:

" . . . A person engaged in the business of purchasing and selling as a broker stocks, bonds or other evidences of debt of corporations, companies or associations, who . . .

"2. Having in his possession stocks, bonds or other evidences of debt of a corporation, company or association belonging to a customer on which he has a lien for indebtedness due to him by the customer, pledges the same for more than the amount due to him thereon, or otherwise disposes thereof for his own benefit, without the customer's consent, and without having in his possession or subject to his control, stocks, bonds or other evidences of debt of the kind and amount to which the customer is then entitled, for delivery to him upon his demand therefor and tender of the amount due thereon, and thereby causes the customer to lose, in whole or in part, such stocks, bonds or other evidences of debt, or the value thereof,

"Is guilty of a felony, punishable by a fine of not more than five thousand dollars or by imprisonment for not more than two years, or by both.

"Every member of a firm of brokers, who either does, or consents or assents to the doing of any act which by the provisions of this or the last preceding section is made a felony, shall be guilty thereof. (Added by L. 1913, ch. 500, in effect May 14, 1913.)"

All orders for the purchase of securities given by their customers "were by Mason & Owen telegraphed to Logan

& Bryan in the name of Mason & Owen." Such telegraphic orders "did not contain any information as to the name of Mason & Owen's customer." The transactions between Logan & Bryan and Mason & Owen were conducted in accordance with the custom described in the stipulation. The orders of Prentice & Company "were executed in precisely the same manner." All of the securities mentioned in the complaint "were either negotiable in form or were endorsed in blank so as to be negotiable and to pass by delivery."

December 1, 1920, the indebtedness of Mason & Owen to Logan & Bryan "was considerably in excess of the entire indebtedness owing to Mason & Owen from all of their customers," but the securities held by Logan & Bryan "were amply sufficient to secure the indebtedness due from Mason & Owen to Logan & Bryan." On the day last mentioned, Mason & Owen, on petition of the plaintiff herein and other creditors, were adjudged to be bankrupt. Their failure "was caused by Charles F. Mason and one of the clerks of Mason & Owen, with the consent of Mason & Owen, purchasing securities as a part of the account between Mason & Owen and Logan & Bryan and charging the expense thereof against all of the securities which were carried in said account and afterward selling said securities for less than they had been purchased for. . . . Said securities purchased by Mason and his said clerk were purchased on telegraph orders given to Logan & Bryan by Mason & Owen in precisely the manner and way" that securities for the customers of Mason & Owen were purchased.

Will J. Thayer, one of the customers of Mason & Owen and now attorney for appellant herein, was duly appointed receiver of the bankrupt estate. As such receiver he petitioned the court for an order directing him "to make sale of all securities including stocks and bonds now pledged with Logan & Bryan by . . . Mason & Owen." The court, on December 2, 1920, ordered the securities involved herein to be sold and the "net proceeds derived therefrom" deposited with the receiver and that "such sale or sales be had in the manner provided by the rules of the New York Stock Exchange." A certified copy of the order was served on Logan & Bryan and the receiver "authorized and requested" Logan & Bryan to sell the securities "in accordance with the provisions of said order." December 3, 1920,

thereof, they were in a more favorable position than other securities for which full payment had not been made. All the other securities had been purchased by marginal customers of either Prentice & Company or Mason & Owen. The relation between each of these marginal customers and Mason & Owen was that of pledgor and pledgee, and Mason & Owen had the implied consent of such customer lawfully to repledge the same. (*Blankenhorn-Hunter-Dulin Co.* v. *Thayer,* 199 Cal. 90 [48 A. L. R. 797, 247 Pac. 1088].) The securities purchased through Prentice & Company were, "with the consent of the purchasers, transferred to the account of Mason & Owen," and therefore no reason appears for making any distinction between them and those purchased through Mason & Owen.

[4] Each customer ordered the securities to be purchased "subject to the rules, regulations and customs of the exchange in which this order is executed." Such rules, regulations, and customs thereby become special terms of the contract. (*Clews* v. *Jamieson,* 182 U. S. 461 [45 L. Ed. 1183, 21 Sup. Ct. Rep. 845, 1194, see, also, Rose's U. S. Notes]; *Goldsmith* v. *Sawyer,* 46 Cal. 209, 212; *Woltz* v. *E. F. Hutton & Co.,* 55 Cal. App. 741, 743 [204 Pac. 248]. See, also, *Miller* v. *Germain Seed etc. Co.,* 193 Cal. 62, 77 [32 A. L. R. 1215, 222 Pac. 817].) All the transactions in question were, on the part of Logan & Bryan, conducted in strict compliance with such rules, regulations, and customs. It does not appear, therefore, upon what grounds they can be held liable to the customers of Mason & Owen.

[5] Appellant contends that Logan & Bryan were not *bona fide* pledgees, "as they knew at all times that the stocks did not belong to Mason & Owen." No authority is cited in support of this contention. Of course, Logan & Bryan knew that Mason & Owen, who were engaged in business as brokers, were not buying all the securities purchased by them for themselves, but the latter had the right "lawfully to repledge the same." (*Blankenhorn-Hunter-Dulin Co.* v. *Thayer, supra; Fowles* v. *National Bank of California, supra,* p. 662.) The evidence does not support the contention that Logan & Bryan were the agents of Mason & Owen. It may be conceded that it was unlawful, as between Mason & Owen and their customers, to repledge the securities for more than the indebtedness of their

customers to them. The purchases for which unlawful repledges were given, however, were made "in precisely the manner and way" as purchases for the customers of Mason & Owen. The court found that these securities of the customers were repledged to Logan & Bryan for individual purchases made by an employee and a member of the firm of Mason & Owen, but "that defendants did not know or have means of knowing until a short time prior to the filing of the petition in bankruptcy, . . . of such practice; . . . and that . . . as soon as such fact came to the notice of the defendants, they refused to transact or carry on any new business for said Mason & Owen," and that until that time "defendants did not know, nor did any of them know or have means of knowing, or reason to believe or suspect, that the indebtedness of Mason & Owen to these defendants was greater than the total amount of indebtedness due to Mason & Owen from their customers."

[6] Appellant contends that "the manner in which these two firms of brokers manipulated the customers' stocks was a fraud on the customers." Plaintiff did not allege fraud, however, and the court found against the plaintiff, on sufficient evidence, upon his allegations tending to show any element of fraud on the part of defendants. Fraud cannot be based upon the fact that Logan & Bryan, in good faith, handled the transactions in accordance with the rules, regulations, and customs which the customers made terms of their contracts of purchase.

[7] Appellant quotes a part of one of the findings of the court as follows: "And said defendants . . . held each and all of the securities so purchased on the order of Prentice & Company to secure the general indebtedness of Prentice & Company, and held the securities purchased on the order of Mason & Owen to secure the indebtedness of Mason & Owen, as hereinbefore found." It is then said: "The above finding, drawn by the defendants themselves, excludes any contention that they ever held the Prentice stocks as security for the debts of Mason & Owen. . . . Prentice & Company had completely discharged their indebtedness." But the court further found, in the same paragraph, that "each of the various customers of Prentice & Company gave to Prentice & Company written consent to have the securities previously purchased by Prentice &

Company on the order of said customer, transferred to the account of Mason & Owen, and that Prentice & Company, from time to time, as they received the written consent of their respective customers to the transfer of the respective securities to Mason & Owen, gave orders to the defendants to transfer such securities to the account of Mason & Owen, but that none of said orders from Prentice & Company to transfer such securities to Mason & Owen contained the names of any of the customers of Prentice & Company, and defendants did not know or have the means of knowing who were the customers of Prentice & Company, . . . that each and all of the customers of Prentice & Company allowed and permitted all securities purchased by Prentice & Company on their respective orders and transferred to the account of Mason & Owen by Prentice & Company, to remain in the hands of defendants, subject to the orders of Mason & Owen, and so treated and dealt with said securities so transferred . . . as to lead defendants to believe that Mason & Owen had full power and authority to sell, pledge or otherwise dispose of said securities.'' It clearly appears that all the acts of the defendants were lawful and within their rights as brokers, and it seems unnecessary to pursue the matter further. The pleadings and findings together cover more than 200 pages and the briefs contain more than 350 pages of argument. It would require an unreasonably long opinion to discuss specifically all the contentions of appellant. They have been given careful consideration and it is deemed sufficient, as to the points not discussed herein, to say that no merit has been discovered in any of them.

Respondents contend that by filing their claims in the proceeding in bankruptcy the customers elected to pursue their remedy therein and are therefore estopped to maintain this action against the defendants. It is true that if the defendants had been required to pay the customers the moneys herein claimed, or to pay the same into the court in bankruptcy prior to the settlement of the bankrupt estate, they would have been in a position to file their own claims therefor and to share in the distribution of the assets of the bankrupts, whereas, if judgment were rendered against them in this action, since the funds which came into the hands of the receiver have been paid out in partial liquida-

tion of other claims, they would be unable to recover any part thereof. Appellant contends that neither election nor estoppel was properly alleged in the answer. The case was tried, however, upon the theory that both were in issue. Appellant urges other reasons why the plea of estoppel or election of remedies is not available to the defendants. It is unnecessary to consider these contentions of the respective parties, because the judgment must be affirmed on the other grounds discussed.

The judgment is affirmed.

Thompson, J., *pro tem.*, and Plummer, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 3, 1927.