[S. F. No. 14122. In Bank.—August 31, 1931.]

HERMAN J. CISLER, Respondent, v. HARRIS A. RAY, Appellant.

Thornton Wilson for Appellant.

A. H. Crook and Sloss & Ackerman for Respondent.

THE COURT.—After a further consideration of the merits of this appeal upon rehearing, we have concluded that the opinion written by Mr. Justice Shenk and filed herein on

April 30, 1931, expresses the present opinion of this court in determining the issues presented on the appeal. Said opinion is therefore adopted as the opinion and decision of this court, and is as follows:

"This is an appeal by the defendant from a judgment for the plaintiff in an action to recover the sum of $8,590, which represents the difference between the price at which 100 shares of Bank of Italy stock were sold and the price at which 100 shares of the same stock were bought pursuant to orders placed by the defendant with and executed by the plaintiff's assignors on June 12, 1928, plus commissions and interest.

"The plaintiff's assignors are Duisenberg-Wichman & Company, stock and bond brokers, who owned at the times herein involved a seat on the San Francisco Stock Exchange and maintained offices in Oakland and San Francisco. The defendant, according to his own testimony, spent his time and effort in investing his own funds, principally in buying and selling stocks as a business for the purpose of making a profit. He had maintained a margin account with Duisenberg-Wichman & Company since April 29, 1927, and had employed them to execute his orders for the purchase and sale of stocks on the San Francisco Stock Exchange. At the commencement of his relations with that company the defendant had executed and delivered to it an agreement which, among other things, provided: 'All transactions are subject to the rules, regulations and customs of the exchange or market (and its clearing house, if any) where executed. In all transactions wherein you act as my agent, I agree to wholly indemnify and save you free and harmless from any loss, damage or liability arising out of such transaction, howsoever same may occur. This agreement shall continue until revoked by me in writing. . . . ' Prior to June 12, 1928, the defendant had closed the margin account, but early on the morning of that day he entered the Oakland office of Duisenberg-Wichman & Company for the purpose of resuming trading.

"At this point it should be noted that about two years previously the 'post system' had replaced what was known as the 'call system' on the San Francisco Stock Exchange. By the system in operation on June 12, 1928, the trading room of the exchange was divided into posts to each of which

was assigned the trading in one stock or more, each of which was in charge of a specialist who was selected from the membership of the exchange. After the commencement of this system brokers placed the customer's order with the specialist to whom was assigned the trading in the stock desired to be bought or sold. The method of operation under the post system differs generally from the call system in that under the latter system only one security was called and traded in at a time. Under the call system, therefore, a broker was able personally to execute the orders of his customer. Under the post system, however, the order is executed through the specialist unless the broker also has an order on the other side of the transaction, which, under the rules of the exchange, he may 'cross' or 'accommodate' at the market price, if the specialist makes no objection. One of the most important functions of a specialist under this system of trading is the exercise of the privilege given to him by the rules of the exchange to make the first bid or offer at the opening of trading on each market day. The exercise of this function entails the necessity of computing an opening price. The process by which the specialist computes the opening price consists in offsetting or crossing the buy and sell orders in his hands, including so-called market orders which are orders to buy or sell at the market price, and by mathematical deductions arriving at a figure which will accommodate a majority of such orders. This process is termed 'making up a book'.

"On June 11, 1928, trading in Bank of Italy stock had assumed such proportions that the spread between the high and low prices for a share of that stock on that day amounted to as much as $155. Mr. Holt, who was the specialist in Bank of Italy stock on the San Francisco Stock Exchange at that time, testified that, by reason of the closing price of about $220 per share on the preceding day, on the morning of June 12, 1928, there was such a preponderance of sell orders in his hands that had he opened trading at the customary hour of 9:30 the opening price for a share of the stock would have been about $125. Accordingly, pursuant to a rule of the exchange, he announced sellers in that stock and delayed the opening until sufficient buy orders had been received by him to justify a higher market price. On that morning the defendant had been in

the Oakland offices of Duisenberg-Wichman & Company since about six o'clock watching the reports of proceedings on the New York Stock Exchange. At 9:30 o'clock the San Francisco Stock Exchange ticker recorded sellers in Bank of Italy stock. At 9:36 o'clock Mr. Ray in Oakland gave an order to sell 100 shares of Bank of Italy stock at the market. This order was received by Mr. Isenberg, the representative of Duisenberg-Wichman & Company, on the floor of the exchange at 9:37. At 9:55 the specialist opened trading in Bank of Italy stock at $150.25. There being no objection on the part of the specialist, Mr. Isenberg crossed the defendant's order to sell 100 shares of Bank of Italy stock with a buy order for 100 shares at the market of the same stock, which at 9:31 he had received from a Mr. Adams, at the opening price. At 9:56 Mr. Ray in Oakland placed an order to buy 100 shares of Bank of Italy stock at the market. This order was received at the San Francisco office of Duisenberg-Wichman & Company at 9:57, and by Mr. Isenberg on the floor of the exchange at 9:58, and was immediately placed with the specialist. Between 9:56 and 10:00 o'clock, or approximately at 9:58, there being an avalanche of buying orders in Bank of Italy stock, and after consulting with members of the floor trading committee, the specialist in Bank of Italy declared a suspension in trading to enable him to make up a new book and announce another or second opening price in that stock. At 10:00 o'clock Mr. Ray in Oakland was in the act of giving another order to buy when news was received that trading was suspended. Mr. Ray thereupon withdrew the contemplated additional buy order and at 10:12 ordered his brokers to cancel his previous sell and buy orders. At 10:13 the cancellation orders were received by Mr. Isenberg's clerk who immediately handed them to the specialist who refused to accept them on the ground that it was 'too late to cancel'. Trading was reopened at 10:31 and at that time the execution of Mr. Ray's order to buy 100 shares of Bank of Italy stock was announced at the new opening price of $230. Information that both the sell and buy orders had been executed, and the terms thereof, was received by Mr. Ray at the Oakland office at 11:15, whereupon he immediately refused to confirm either of said orders. Subsequently this action was commenced to recover the loss sustained by the brokers by reason of the

refusal of Mr. Ray to confirm the execution of his orders to sell and buy, plus interest and commissions.

"The trial court found, among other facts, that the defendant, at the time he gave the orders here involved, was an experienced trader and had knowledge of the conditions affecting the trading in Bank of Italy stock on the San Francisco Stock Exchange at that time; that the written agreement executed by the defendant in April, 1927, was unrevoked and in full force and effect, and that on the 12th day of June, 1928, the following rules, regulations, customs and usages of the San Francisco Stock Exchange were in effect: 'First: That a broker having orders on both sides of a transaction may cross such orders by placing stock on record at the opening sale price, if the specialist shall not object, which transactions are known as "accommodation sales" and may be recorded on the ticker if not objected to. Second: That a broker may entrust the execution of a customer's order to another broker or a so-called "specialist". Third: That the specialist has a right to delay the opening of the market on any stock allocated to his post. Fourth: Specialists may refuse to accept orders in an emergency. Cancellations are considered as orders. Fifth: Specialists may suspend trading in an emergency. Sixth: The specialist has the right to make the opening bid and offer of stock, provided such bid and offer shall be made immediately one after the other. Seventh: Specialists may decline to receive orders for a period of ten minutes prior to the opening so as to enable the specialist to make up his book. Orders include cancellations.'

"The court also found that the defendant's order to sell 100 shares of Bank of Italy stock at the market was promptly executed at 150¼, the opening price, and that the defendant's order to buy was received too late to participate at the opening of trading; that shortly thereafter trading in said stock was suspended because of an emergency then and there prevailing in the trading of said stock on the floor of the exchange and that trading in said stock was not normal and was close to a panic. ▮ The court found further that orders of cancellation are included and come within the rule of the exchange which provides that a specialist may refuse orders in an emergency and that the defendant's brokers acted with the utmost diligence and care in the performance

of their duty, and did everything within their power to carry out and execute promptly and expeditiously the defendant's orders.

"An additional finding that the contracts of the parties contemplated actual deliveries of shares of stock, and that there was no violation of the provisions of section 26 of article IV of the state Constitution, lifts out of the case any contention that the contracts or transactions involved were illegal. It is conceded that the specialist in Bank of Italy stock was acting as the agent of Duisenberg-Wichman & Company.

"The serious dispute on this appeal arises over the contention of the defendant that the evidence does not support the trial court's finding that cancellations are considered as orders within the rules, regulations, customs or usages of the exchange so as to make the defendant liable under the circumstances here presented, and that nevertheless the brokers' delay in advising the defendant of the refusal of the specialist to honor the cancellation orders and of the execution of the sell and buy orders constituted negligence which was the proximate cause of the loss sought to be recovered.

"It is conceded that no written rule or regulation of the stock exchange at that time contained the language 'Cancellations are considered as orders' or 'orders include cancellations' used by the trial court in the portion of its statement of the rules, regulations, customs and usages designated respectively as 'Fourth' and 'Seventh'. It is not disputed that the rules or regulations passed by the governing board of the stock exchange in effect and pertinent to the privilege of the specialist to refuse to accept orders are: A rule dated April 11, 1927, providing that 'the presentation of cancellation of orders to the specialist during the five-minute period prior to the opening is subject to the same rules and limitations to which buying and selling orders are subject when presented to the specialist during that period'; a rule dated April 19, 1928, providing in part, 'All orders whether or not they are for odd lot stocks must be in the hands of the specialist ten minutes prior to the opening to participate therein'; and the rules that 'the specialist has the right to suspend trading in an emergency' and 'specialist may refuse to accept orders in an emergency'. It will be noted here that the defendant's cancellation orders were handed to the

specialist and rejected by him eighteen minutes prior to the second opening. The question resolves itself then into whether the trial court's finding that the word 'orders' contained in the rule that 'specialists may refuse to accept orders in an emergency' includes 'cancellations of orders' is supported by custom or otherwise. No contention can be made, in view of the contract of April, 1927, executed by the defendant, that the laws, regulations, rules, customs or usages of the stock exchange would not be binding on the defendant whether or not he knew of their existence. (*Thomson* v. *Thomson,* 315 Ill. 521 [146 N. E. 451].) ■ The trial court found that an emergency verging on a panic existed, and as to this finding there is no dispute. We may also add at this point that this undisputed finding compels a conclusion that we may not find as a matter of law that the defendant's brokers were negligent by reason of the delay in informing the defendant of the rejection of his cancellation orders and the execution of his buy and sell orders. Whether the result might be different in normal times is not the question here, but under the particular circumstances presented by the record we must conclude that the finding that the brokers were free from negligence is sufficiently supported by the evidence.

■ ''The defendant, however, is asking for a reversal of the judgment against him on the ground that as the evidence showed that no emergency other than that which existed under the facts of the present case had occurred with respect to trading on the floor of the San Francisco Stock Exchange since the rules and regulations here involved became effective, no custom or usage to the effect that in an emergency cancellations may be treated as orders could have become established. Nevertheless, the record is replete with testimony to the effect that the system of post-trading is impracticable and unworkable unless the specialist during the period required to make up a book may refuse any order or direction which will necessitate a change in the entries in his book during that period. The evidence substantially supports the finding of the trial court that, as a result of this condition, by implication, custom or otherwise, the five-minute period before an opening when cancellations were given the same status as buy and sell orders was also extended to ten minutes when the rule of April 19, 1928,

extending the period for rejecting buy and sell orders to ten minutes became effective. This period was placed at ten minutes for the reason that experience had shown that that was the time generally required by a specialist in a normal market to make up a book which would comprise all of the orders, including market orders, then in his hands. It must be obvious then that an avalanche of orders such as was presented to the specialist prior to the second opening in Bank of Italy stock on June 12, 1928, could not be accommodated without a new book being made up and the result of such an avalanche was to extend the period required by the specialist to make up his book beyond the ten-minute normal period prescribed and that this necessary extension of the normal time was in fact the emergency so created. We see no reason, and the appellant has presented none, why it was not competent for the trial court to conclude that the effect of the rule relating to the ten-minute period prior to an opening when cancellation and buy and sell orders may be rejected should not continue when by reason of an abnormal flood of orders that period was necessarily extended beyond the ten-minute regulation, inasmuch as the evidence was uncontradicted that during any period required for the purpose of permitting a specialist to make up a book it was customary to refuse all orders, including cancellations.

"We also fail to perceive how a question of reasonableness of the rule or custom may enter into the discussion. The defendant expressly contracted to be bound by the rules, regulations, customs and usages of the exchange, without any limitations or restrictions or conditions, and, as indicated in *Thomson* v. *Thomson, supra,* he must therefore either conform to or repudiate and terminate his written contract.

"On the record presented we must conclude that the defendant has shown no ground for a reversal."

The judgment is affirmed.

LANGDON, J., Dissenting.—I dissent.

It seems to be conceded, and it could hardly be denied, that the specialist, although an officer of the exchange, acts in the capacity of agent of the brokers who deal in the stocks which he handles; and the broker would ordinarily be liable to the customer for negligence or wilful breach of duty on

the part of the specialist. (See *Murphy* v. *Bishop,* 182 App. Div. 805 [170 N. Y. Supp. 342] ; Meyer, Stock Brokers and Stock Exchanges, p. 487.) It is true that the defendant entered into an express agreement to be bound by all rules, regulations and customs of the exchange, but a study of the record reveals no custom and no rule to support the finding of the trial court. Indeed, plaintiff admits that no custom exists, not only because of the lack of any positive evidence to that effect, but because the particular situation which existed was without precedent in the San Francisco Stock Exchange, and no custom could possibly have become established. Plaintiff's theory is that the finding is an interpretation of the rules themselves, and that this interpretation is compelled by the necessities of the post-trading system. It is said that the purpose of a suspension of trading is to permit the specialist to make up his book, and that it is essential that this operation be undisturbed. If a new order to buy or sell were forced upon him, his figures would have to be changed, and his computation of a new opening price would be delayed. Exactly the same result would follow, it is contended, by forcing him to accept a cancellation; and the testimony of the specialist is to this effect. But I see no reason for holding that a heavy loss should be borne by a client of a broker because the brokers operating on the exchange have adopted a system which becomes unworkable in an emergency. If the system requires, at the discretion of the specialist, a power to disregard the directions of a client, it is essential that this power be provided by express rule, so that the client may know in advance of the existence of this extraordinary modification of the usual principles of the law of agency. Of course, it is settled that the customer normally has the right to cancel any unexecuted order. (*Wahl* v. *Tracy,* 139 Wis. 668 [121 N. W. 660] ; Meyer, Stock Brokers and Stock Exchanges, p. 273.) In short, I cannot accept the proposition that the rule contended for must exist because the exchange could not function effectively without it. Our sole inquiry is as to whether such a rule was actually made and became part of the contract of defendant with his brokers. The answer to this inquiry necessitates the application of the ordinary doctrines governing the interpretation of contracts.

There are four rules of the exchange covering the powers of the specialist which are considered by plaintiff to be relevant in this connection. One provides that "all *orders* . . . must be in the hands of the specialist *ten minutes prior to an opening* to participate therein". Another provides: "The presentation of *cancellation of orders* to the specialist during the five-minute period prior to an opening is subject to the same rules and limitations to which *buying and selling orders* are subject when presented to the specialist during that period." A third gives the specialist "the right *to suspend trading* in an emergency"; and a fourth provides that the specialist "may refuse *to accept orders* in an emergency". The term "trading" is not defined in the rules, but it can hardly be deemed to include cancellations of orders, the very opposite of trading. The particular ground upon which the lower court seems to have proceeded was that the term "orders" in the fourth rule included "cancellations", and it is upon this rule that plaintiff chiefly relies.

The difficulty with this view is that the very rules which are being interpreted use the terms in a specific and not a general sense, and they distinguish clearly between orders and cancellations. The "five-minute" rule, above quoted, expressly provides that *"cancellations of orders"* are, under the particular conditions set forth, subject to· the same rules and limitations as *"buying and selling orders"*. Nothing could more clearly indicate an understanding of the terms as being distinct and different in their meaning. No reasonable person, reading the rules, and observing this special use of each term, could have any doubt of this intended meaning. Moreover, to refuse to accept an order to buy or sell during a suspension means to delay it until the suspension is over, and to deprive the customer of the benefit of the opening price. Ultimately it is executed and the customer merely loses the advantages which an earlier execution might have given him. But to refuse a cancellation is to act contrary to the customer's directions, and to execute an order which has been revoked. This fundamental difference in their legal effect removes all logical ground for considering that "cancellation" is included within the meaning of "order". But even if it were conceded that there still is uncertainty as to the meaning of the term "orders",

which calls for its construction, it does not follow that the construction must be determined by the alleged necessities of the exchange. The rules were drafted by the members of the exchange, representing all the brokers who did business there, and an ambiguity, if any exists, must be resolved against the brokers. "The language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist . . . " (Cal. Civ. Code, sec. 1654; see *Robert Marsh & Co.* v. *Tremper,* 210 Cal. 572 [292 Pac. 950]; *Klapp* v. *Bache,* 135 Misc. Rep. 508 [239 N. Y. Supp. 129]; 6 Cal. Jur. 307; 13 C. J. 544, sec. 516.)

The other ground upon which defendant attacks the judgment is that the broker was guilty of a breach of duty in failing to notify the defendant of the refusal of the specialist to accept the cancellation until about one hour had elapsed. It appears that the defendant was in the offices of the brokers throughout this entire period, and that he continuously requested a report on his cancellation. The explanation offered by the broker is that an unusual volume of business had caused them to utilize their wires almost exclusively for new orders, and that they were too busy with the orders to handle such reports. This is, in effect, to say that the opportunity to accept new and profitable business constitutes a justification for rendering poor service to customers whose business was already undertaken. Unwarranted delay in reporting the status of a customer's orders constitutes a breach of the obligation assumed by the broker, and there can be no doubt, from the explanation given by the brokers, that this delay was unwarranted. The contention that it worked no injury to defendant is absurd on its face. Had he been aware of the circumstances he might have accomplished something in the nature of a cancellation by placing a sell order to offset his buy order; and though he would not have secured the opening price, the order would probably have been executed at a figure near that price.

My conclusion is that the cancellation directed by defendant should have been given effect by the specialist, and that for his unwarranted refusal the broker is responsible as his principal. I am also of the view that the failure of the broker to report promptly to the defendant the fact of this refusal was a breach of the contractual obligations assumed toward him. On both of these grounds defendant was justi-

fied in denying liability for the loss suffered through the executed order to buy. The judgment of the lower court should have been reversed.

Curtis, J., and Seawell, J., concurred.

Rehearing denied.

Seawell, J., Curtis, J., and Langdon, J., dissented.