282 P.2d 841

Cecil L. LYNCH, Plaintiff and Appellant,

v.

George C. MAW, Administrator of the Estate of Richard C. Badger, deceased, and J. A. Hogle, James E. Hogle and numerous other persons, a partnership, d/b/a J. A. Hogle & Co., Defendants and Respondents.

No. 8022.

Supreme Court of Utah.

April 25, 1955.

Rawlings, Wallace, Roberts & Black, Dwight L. King, Salt Lake City, for appellant.

Marr, Wilkins & Cannon, Richard H. Nebeker, Salt Lake City, for respondents.

CROCKETT, Justice.

The question presented by this appeal is whether a stock broker who purchased stocks on the New York Stock Exchange on behalf of an "outside" broker, held them in pledge to support the latter's account and resold them upon his order is, upon the outside broker's defalcation, responsible to the customer who has paid the outside broker in full for the stock.

Upon suit by Cecil L. Lynch (the customer) against J. A. Hogle & Company (the exchange seat broker), the trial court dismissed plaintiff's action at the conclusion of his evidence on the ground that Hogle was neither legally nor equitably responsible to plaintiff for the defalcation of Richard C. Badger & Company (the outside broker). Plaintiff appealed.

On March 14, 1951, plaintiff placed an order with Badger, who had no seat on the New York Stock Exchange, for 40 shares of stock in Standard Oil of California. On March 15th, without disclosing his principal, Badger placed an order with Hogle, a broker with a seat on the exchange, to purchase 53 shares of Standard Oil stock. Hogle purchased the stock in due course and held separate certificates for 50 and 3 shares in Badger's "omnibus account" in pledge to support its credit, as permitted by broker's custom. March 16th, Hogle notified Badger of the purchase and indicated that the time of settlement was March 20th. Badger in turn advised Lynch that the purchase of his 40 shares had been made, and Lynch thereafter paid to Badger the amount due, $1,793.45. Before the settlement date Hogle received a check for $40,000 from Badger which it applied on Badger's account. On March 24th Badger, without any authority from Lynch, ordered Hogle to sell 50 shares of the Standard Oil stock from his account. This was done and the proceeds credited to Badger. Due to the fact that Badger had a total of only 75 shares of Standard Oil stock in his account, this sale of 50 shares left only 25, 15 short of the 40 he was supposed to be holding for Lynch. Badger died March 27, 1951, deeply indebted to Hogle.

It is the position of plaintiff Lynch that Hogle knew Badger was purchasing stock for customers; that when the purchase of Standard Oil stock on March 15th was covered by the $40,000 check before the settlement date Hogle was obliged to know that this particular 40 shares was paid for; and that the stock should have been held for delivery to Badger's customer Lynch. Therefore, plaintiff avers, Hogle, in honoring Badger's request to sell the stock,

wrongfully cooperate in converting it and is obliged to hold the proceeds it received in trust for plaintiff.

Plaintiff's position is unsound. It is true that Hogle knew that Badger was a broker and was buying stocks for customers. Yet Hogle had no way of knowing who Badger's customers were, nor the status of his dealings with them. There is nothing in the evidence to suggest that Hogle did in fact know for whom the 40 shares of stock were purchased; nor that they were paid for. The plaintiff is undoubtedly correct in saying that Badger could have been purchasing the stock for a customer who had paid in full, but he could also have been purchasing it for a customer who had not paid, or even for himself for anything Hogle knew, and furthermore the order to sell the 50 shares could have been upon the request of a customer. If Hogle as an exchange seat broker is obliged to know for whom the 40 shares were purchased, and whether the customer had paid for them, it would have to learn the status of each stock held in the account of an outside broker and require assurance that the ultimate purchaser of the stock had given the outside broker authority to sell. Where the exchange seat broker and the outside broker are in competition for business, as is the case here, it is not to be expected that one broker will disclose his customers and the details of his business to another. If Hogle wished to continue to do business for outside brokers such as Badger, it had no practical alternative to complying with Badger's order to sell the stock in the regular course of business and crediting the proceeds to his account, as it did.

Hogle had been buying and selling stock in this omnibus account upon Badger's order ever since it was established and had no reason to suspect that the transaction in question was any different from numerous others that had preceded it. The stock here was purchased upon Badger's order and for Badger's account. He alone had authority to order it sold and was the only one entitled to receive the stock or the proceeds from its sale. It is not disputed that Hogle could immediately have delivered the proceeds from sale of the stock to Badger without liability to Lynch; nor is it controverted that Lynch could not have demanded delivery of the stock from Hogle, for there was no privity of contract between them.

There is no disagreement between the parties as to the fact that it is a well establishing custom in the brokerage business that when an exchange seat broker purchases stock for an outside broker and holds such stocks in the latter's account, all of the stocks held therein are pledged to support the outside broker's credit,[1] or that such was the understanding between Badger and Hogle.

---

1. See, e. g., Bennett v. Logan & Bryan, 1927, 80 Cal.App. 571, 252 P. 662; Korns v. Thomson & McKinnon, D.C.1938, 22 F.Supp. 442.

It is recognized that a customer who engages a broker to execute an order on the stock exchange, confers authority on the broker to conduct the transaction according to the rules and established customs of the exchange,[2] and generally the customer is bound by such rules and customs whether or not he has actual knowledge of them.[3] It was Lynch who selected Badger as his agent and clothed him with authority to perform his duties in accordance with the customs of the business.[4] Nothing here appears from which Hogle would have any reason to suspect the agent of dishonesty or insolvency, nor to surmise that Badger was in any way exceeding his authority or that there was any irregularity in the transaction. Under such circumstances Hogle was not only justified but required to handle the order as Badger directed. We see nothing either unreasonable or illegal in Hogle's conduct which would bring it under the rule contended for by Lynch that the customer should not be bound by any unreasonable or illegal rule or custom of the business.[5]

The only case of which we are aware in which any court in this country has dealt with the problem before us is Korns v. Thomson & McKinnon,[6] which we regard as persuasive. There a customer (Korns) placed an order with an outside broker (Harper Strauss & Co.), who in turn ordered the stock from an exchange seat broker (Thomson & McKinnon). The exchange seat broker bought the stock on the New York Stock Exchange and held it in the outside broker's account. When the latter became bankrupt the customer brought action against the exchange seat broker to recover the stock. The exchange seat broker claimed that the stock was pledged to support the outside broker's credit. In dismissing the customer's action the Minnesota Federal District Court said:

"When the plaintiff and his assignors caused their orders for the purchase of certain stocks to be given to Harper Strauss & Co. they understood, or should have understood, that the orders were for execution, in the New York Stock Exchange. They knew, or should have known the relation of Harper Strauss & Co. to this exchange, and its mode of transacting business therein through other brokerage houses. They must be held to have contemplated and authorized a course of dealing in accordance with the rules and customs of the New York Stock Exchange."

Likewise we have found sustaining plaintiff's position only the English case of

2. Note Cisler v. Ray, 213 Cal. 620, 2 P.2d 987, 79 A.L.R. 592.

3. Ibid.

4. Restatement, Agency § 36.

5. Note, 79 A.L.R. 604–608.

6. D.C.1938, 22 F.Supp. 442; see also Austin v. Hayden, 1915, 171 Mich. 38, 137 N.W. 317; Bennett v. Logan & Bryan, 1927, 80 Cal.App. 571, 252 P. 662.

Blackburn v. Mason,[7] decided in 1893, a decision which may or may not be correlated realistically to present American business customs.

The trial court's dismissal of plaintiff's action is affirmed. Costs to respondent.

McDONOUGH, C. J., and HENRIOD, J., concur.

JEPPSON, District Judge (dissenting).

The principal issue is whether the defendant, J. A. Hogle & Company, had a lien on the proceeds from the sale of certain stock or on the shares of said stock, which were originally purchased for Cecil L. Lynch, in order to pay the debts of Richard C. Badger & Company due to the defendant, J. A. Hogle & Company.

The general rule,[1] subject to certain limitations, is that customer who engaged a broker to execute an order on the Stock Exchange confers authority on such broker to conduct the transaction according to the rules and the established customs of the Exchange on which he deals, and the customer, although he does not have actual knowledge of the rules and customs, is bound by them. This rule, however, is restricted and does not apply to rules or customs which are either illegal or unreasonable.[2] The custom used by the defendant in this case was that the correspondent broker could borrow money on any assets in his account with the member broker, or defendant. This rule is broad enough to permit a correspondent broker to buy stock for and to collect from a customer, to pay for and buy stock for said customer, and then borrow on the stock to finance other transactions.

Where a customer's assets were seized to pay the debts of a correspondent broker, in the earliest reported case we know of on this subject, an English Court in 1893, declared it an unreasonable rule, and therefore not binding on the customer. The decision is quoted as follows:[3]

"and it was held * * * that a custom among stockbrokers that a member of a London Stock Exchange who has sold stock on the instructions of a country broker who was acting for an undisclosed principal, is entitled to set off against the price of the shares, a debt due to him from the Country broker arising out of prior transactions on the exchange, was unreasonable, and not binding on the principal of the country broker, unless he had knowledge of the custom and agreed to be bound by it."

The question could have been considered in the Korns case,[4] where a Federal Dis-

---

7. 68 L.T.N.S. 510 (1893), cited in In re Fulton, 257 N.Y. 487, 178 N.E. 766, 79 A.L.R. 608.

1. Cisler v. Ray, 213 Cal. 620, 2 P.2d 987, 79 A.L.R. 592.

2. 79 A.L.R. 604.

3. Blackburn v. Mason (1893) 68 L.T.N.S. (Eng.) 510–C.A.; In re Fulton, 257 N.Y. 487, 178 N.E. 766, 79 A.L.R. 608.

4. D.C., 22 F.Supp. 442.

trict Court opinion follows the general rule, without referring to the exceptions. I am not aware of any other court decision on this point.

The members of the stock exchange have adopted this rule and used it to protect themselves against the defalcation of their correspondent brokers by requiring the customers to forfeit the assets in the hands of the exchange brokers, when a correspondent broker has been given credit and then collapses.

An examination of the facts here shows no justification for the application of the general rule in this case. This case is the unreasonable exception to it.

March 15, 1951

The plaintiff Lynch directed Badger to buy 40 shares of Standard Oil of California. Badger wired Hogle for the 40 shares, Hogle bought the 40 shares, and credited the certificates to Badger's omnibus account, charging Badger with the cost, and notifying Badger to pay for said shares by March 20.

March 16, 1951

Lynch was notified of the purchase and paid Badger in full. At this time Hogle had a lien on the stock for the cost, but whether he also had a lien on it for any other debts of Badger is a point in dispute, but Badger then had no unsecured debt with Hogle, so it is a moot issue at this point.

March 20, 1951

This was the settlement date. Badger gave Hogle $40,000. This check of Bad-ger's was honored at the bank. Badger did not withdraw the Lynch shares. Hogle & Company would at that time have delivered the shares to Badger, under the evidence in this case, had Badger asked for them. If Badger had died at this point and left no obligations to Hogle, the stock could have been recovered by the plaintiff Lynch.

Hogle & Company was fully paid and had no lien on the stock, unless the exchange rule would permit Hogle & Company to lend to Badger for other transactions, and then and in that event, a lien would be created on Lynch's stock for Badger's personal loan. That is the practice that the English Court condemned and the Stock Exchange claimed was a custom, but no Court has ever approved it that has been brought to our attention, except in the Korns case, supra.

March 24, 1951

Badger wired Hogle to sell 50 shares. Hogle sold and credited Badger with the sales price. This was an act of conversion by Badger, but Hogle & Company was protected in the sale and could have paid Badger the proceeds without any legal liability.

March 24, 1951

Badger exchanged checks with Hogle & Company. Badger gave a $34,000 check that was not honored on presentation, and received a $32,000 check from Hogle & Company, and a $2,000 credit to the Badger omnibus account. In this transaction Hogle & Company may have had one of two intentions. It could have intended

to secure the Badger check by relying upon the assets in Badger's omnibus account. Hogle had reason to believe that these assets were partly or wholly the property of the customers of Badger. The other intention that Hogle may have had was to just trust Badger & Company on the check until it was paid, and enter the transaction in the omnibus account, as a matter of convenience. Badger also had a personal account which Hogle & Company was not using, but was entering all such matters to the omnibus account along with stock transactions for Badger's customers.

March 27, 1951

Badger died. Thereafter Hogle & Company charged the omnibus account with the bad check, $34,000, and thus used the proceeds from the sale of the Lynch stock to reimburse Hogle & Company for the bad check when it was returned.

At any time prior to the application of this charge to offset the bad check with Lynch's credits, Hogle & Company could have given the shares or the proceeds from their sale to Badger, and could have been legally safe in relying upon Badger's delivering them to the rightful owner, but after Badger died, Hogle & Company should not be permitted to appropriate Lynch's assets to pay for a bad check that Hogle & Company had trustingly accepted on a personal transaction with Badger. It is true that Hogle & Company then did not know that Lynch was the owner, but Hogle & Company had reason to believe that someone other than Badger was probably waiting for the assets.

I dissent in this case because the majority opinion aids a broker in financing a private transaction with the assets of the customers of the Stock Exchange. I believe that the English Court was right in saying that it was an unreasonable practice, and I do not know of any other business that has legal sanction in imposing on the public in such a manner.

WADE, J., concurs in the dissenting opinion of JEPPSON, District Judge.

WOLFE, C. J., being disqualified did not participate in the hearing of this cause.