[Civ. No. 34258. First Dist., Div. Three. Apr. 10, 1975.]

HERBERT NEWMAN, Plaintiff and Respondent, v.
FIRST CALIFORNIA COMPANY et al., Defendants and Appellants.

**COUNSEL**

Bronson, Bronson & McKinnon, Paul H. Cyril and Jerald R. Cochran for Defendants and Appellants.

Maloney, Chase, Fisher & Hurst and James T. Hurst for Plaintiff and Respondent.

## Opinion

**GOOD, J.**\*—This is an appeal from a judgment upon a jury verdict awarding respondent Newman $42,461. The complaint charged appellants First California Company, Leonard Talbot, a stockbroker, and its employee, and Mrs. Ned F. Mann with breach of contract and negligence in relation to Newman's attempted purchase of 30 shares of Modesto Savings and Loan Association (Modesto Savings, *post*).

On or about February 10, 1969, Talbot informed Newman at respondent's Santa Rosa office that a $40,000 profit might be made on a purchase of stocks that he thought he could arrange. Newman said he would think it over. Meanwhile Talbot contacted Ned F. and Mary Mann and on February 14 secured their written authorization to sell 101 shares of Modesto Savings at $500 per share net to them.[1]

On the same date, the Manns gave First California a similar authorization to sell 47 shares of Modesto Holding Company at $60 a share. This latter stock was not part of any dealing between Newman and First California. The Manns had instructed that the two sales were to be dependent upon each other. On February 17, when Newman placed his written order for 30 shares of Modesto Savings at $530, the price named by Talbot, Talbot had orders for all of the Mann stock in both companies. This order to buy was prepared by Talbot and contained the work out and dual agency references spelled out in the last paragraph of the order to sell. (See fn. 1, *ante.*)

Some four months before this, Talbot himself had bought a block of Modesto Savings from Mrs. Mann's daughter at $500 per share net, along with her holding company stock which was finally sold for about $50 per share. On February 12 First California had sold a block of Modesto Savings at the same price quoted to Newman. Talbot testified that he discussed prices with the Manns and explained to them a $10 increase in the price of the holding company shares was justified because of an intervening dividend of $5 per share.

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]This authorization reads:

"This is your authorization to sell 101 shares of Modesto Savings and Loan at a price of $500.00. It is understood the $500.00 will be after deducting your 3% commission so that I net $500.00.

"I understand that there is a 'work out' market in the stock and that First California Company also represents the Buyer in this agency transaction."

On February 17 Talbot teletyped to First California's San Francisco office the matching buy and sell orders for all of the Manns' stock. On the same day he left a telephoned message for Newman that the deal was going through and details would follow in a day or two. He also wrote a brief confirming letter: "Your order has gone thru. The 30 shares will be confirmed in your name." Later that day Talbot went to Newman's office and had him sign the order to buy 30 shares. Talbot said he had made a special trip and had secured the stock and told Newman, "you've got a deal." He did not mention any conditions that had to be met. Newman understood the sale was complete except for registration, transfer and issuance of new certificates in his name.

On February 21 Newman went to Talbot's office to check on the sale. Talbot showed him a press announcement of the merger of Modesto Savings and Loan with Golden West Financial. Newman still wanted to know where the stock was. Talbot said they were not confirming it because the price was no longer fair.

At the trial there was considerable confusion over the meanings of "work out market" and "over-the-counter" transactions. There was a conflict in the testimony over the definition of "work out" market. The National Association of Securities Dealers, Inc. (NASD) manual does not define it. First California claims it refers to sales where it is difficult to ascertain market price because the stocks are rarely traded. They claimed that as members of NASD they were required to make an independent investigation of the price for fairness to both sides despite the fact the price had been agreed upon in the negotiations with sellers and buyer.

The bone of contention was whether, in the existing circumstances, NASD rules and regulations required the broker's independent investigation of fairness as a condition of sale in addition to pertinent requirements of state and federal law. The judge stated in chambers that merely belonging to a self-regulating group did not "replace California law or the requirements of the SEC, or the State Securities Brokers law." He clearly stated that unless First California could show him a binding regulation to that effect he would not allow NASD rules in evidence. Unfortunately, the testimonial confusion and counsel's failure to accept or, perhaps, understand the judge's ruling were the occasion of many exchanges before the jury and interventions by the judge to question counsel and witnesses throughout the course of the trial. The record presents the following issues on appeal:

1. Do NASD rules require a broker's independent investigation of the fairness of price of a rarely traded stock in a work out market? No.

■ The instant sale was an over-the-counter transaction. The over-the-counter market is deemed to include all transactions in securities which take place other than upon a national exchange. (5 Loss, Securities Regulation (Supp. to 2d ed. 1969) p. 3313.) Appellants cite cases holding that a person trading on an exchange is bound by contract to its rules and customs. (*Cisler* v. *Ray* (1931) 213 Cal. 620, 628 [2 P.2d 987, 79 A.L.R. 584]; *Liberman* v. *McDonnell* (1929) 97 Cal.App. 171, 178 [275 P. 486]; *Bennett* v. *Logan & Bryan* (1927) 80 Cal.App. 571, 580 [252 P. 662].) They are not applicable because the subject transaction was not on an exchange. The NASD was established by the Maloney Act in 1938 as a self-regulating association of members who participate in over-the-counter market transactions. Membership is not mandatory but carries privileges to participate on a preferential basis. (NASD Manual (1973) ¶¶ 101-102, pp. 109-110.) Appellants have failed to demonstrate that NASD rules have the same status as those regulating the national exchanges. Further, they failed to demonstrate at trial or in this court that they had the alleged duty to investigate under these rules.

The regulations relied upon as establishing the duty to set the price are NASD Rules of Fair Practice, article III, sections 1 and 12. (NASD Manual, article III, ¶¶ 2151 and 2162.) Section 1 requires members to "observe high standards of commercial honor and just and equitable principles of trade." An interpretation by the NASD board of governors as to retail over-the-counter transactions says that "a member . . . shall use reasonable diligence to ascertain the best *inter-dealer market* for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions." [Italics supplied.] This notation was not brought to the attention of the trial court and was not argued here. If it was applicable at all, it appears to us that any duty to investigate an interdealer market for Modesto Savings would have to be discharged before a broker procured binding offers to sell or buy. Section 12 relates to a broker's duty to disclose his capacity in the transaction, i.e., as broker for one or both parties or as dealing in his own capacity as well as other information not here pertinent.

Appellants also claim that there is case authority for their proposition that the contract was not complete until the broker verified the price. The only case cited is *In the Matter of Samuel B. Franklin & Co.* (1957-1961

CCH Fed. Sec. L. Rep., ¶ 76,647). It is not in point. It affirmed a disciplinary action against a brokerage firm for charging excessive markups or markdowns on stocks for which there were readily ascertainable market prices. There is a precise NASD rule governing this problem, rule 4 (NASD Manual, art. III, ¶ 2154), which applies to "over-the-counter transactions" in listed or unlisted securities and requires a member who either buys or sells for his own account to do so at a price which is fair to the customer.

This requirement is clearly limited to cases where the member broker deals on his own account. Concededly, it imposes a duty to investigate "market conditions at the time of the transaction" and to determine fairness of price if the broker is to escape NASD's censure or possible civil liability to customer for breach of fiduciary duty. The presence of that requirement as an NASD rule and its limitation to an interdealer transaction argues that such investigation is not required in an arm's length deal between a willing buyer and seller who have agreed upon price.

Appellants also rely on the fact that the sellers wanted to sell all the stock or none. They argue there was a change in the holding company stock from the previous sale; therefore its price must be investigated and all the sales held up in the meantime. Talbot claims to have informed Newman of this condition; Newman denied this and we must assume the jury resolved the conflict in his favor. Because the condition did not exist under any NASD regulation we have been able to discover, appellants' argument fails. The condition, if it existed in Talbot's mind, was never disclosed to either buyer or seller. Had it existed, it would at most be an undisclosed term that did not become part of the contract. (Cf. *Horacek v. Smith* (1948) 33 Cal.2d 186, 193-194 [199 P.2d 929].)

■ The buyer's complaint stated a cause of action for negligence. The matching buy and sell orders for all of the Mann stock put the broker under an obligation to complete the transaction with reasonable diligence. If there was a duty to investigate fairness of price as of February 17, the price of the same stock at a sale consummated on February 12 was of record in First California's office. It, as well as the four months old sale, was discoverable, according to First California's transfer officer's testimony, in less than half an hour. The transfer agent also admitted the obvious, i.e., that fairness of price was to be determined as it existed on February 17. The merger announced on February 20 or 21 was a future event that neither buyer, seller or broker could predict. Impending mergers are usually known only to a small

circle of trusted executives of the corporations involved and are not discoverable by others until public announcement is made. There is no inference that buyer or seller had inside information on February 17 or that the broker could have secured access thereto. The merger's impact on price occurred after its announcement and did not affect the fairness of price on February 17.

2. Did the court erroneously refuse to instruct on the duty of a broker and the measure of damages? No.

■ As to the broker's duty, it is reversible error to refuse to instruct a jury on a party's theory of the case only when that theory is supported by the pleadings and evidence. (*Phillips* v. *G. L. Truman Excavation Co.* (1961) 55 Cal.2d 801 [13 Cal.Rptr. 401, 362 P.2d 33].) In this case there was testimony about the duty, which was supposed to rest on NASD rules. But the rule simply did not exist. In such a circumstance, though appellants requested the instruction, it was not error to refuse it. The judge instructed the jury that a broker is a fiduciary who owes the highest good faith and integrity to his customer.

First California's witnesses, as experts, testified to their duty to investigate and plaintiff's expert testified there was no such duty. The judge's acceptance of the latter was not a matter of weighing the evidence. It was a correct decision on a question of law. The fact that defendants testified to such a duty did not raise a question of fact when they could not produce any law or regulation that imposes such a duty and would be a defense to a breach of contract action or remove the stigma of negligence from the unjustified delay in closing the sale.

■ The measure of damages issue arises out of appellants' contention that it was error to refuse to instruct that 10 shares which respondent intended to buy for his children should not be considered by the jury. Respondent testified that 10 of the 30 shares were intended for his children. They were to be in his name as custodian under the Uniform Gifts to Minors Act. In February 1969 the eldest child was 20. The age of majority was then 21. (Civ. Code, § 25.1.) The Uniform Gifts to Minors Act states that the custodian holds in trust all rights and powers of a guardian. (Civ. Code, § 1158, subd. (i).) A minor may enforce his rights, but the action must be brought by his guardian. (Civ. Code, § 42.)

But this intention was not made part of the sale and was not incorporated into the purchase order which was placed in a single block. Newman alone signed the buy authorization. Talbot's letter of February

17, though never sent because he went to Newman's office, said the shares would be confirmed in plaintiff's name. It was not error to refuse this instruction.

3. Did the judge's comments constitute prejudicial misconduct and violate appellants' right to a jury trial? No.

■ Appellants cite several instances of judicial misconduct. It is misconduct for a judge to make comments which indicate more than a slight leaning to one side. (*Davis* v. *Pezel* (1933) 131 Cal.App. 46 [20 P.2d 982].) The judge repeatedly emphasized that the contract was governed by California law. The interpolations were lengthy and sometimes sarcastic. Although some of them were proper in order to clarify to the jury the concepts of "over-the-counter," "work out" markets, and the manner in which a sale is finally completed, we do not agree with respondent's contention that they were invited by counsel's persistence in pursuing a phantom defense.

This is admittedly a close case on the misconduct issue because the judge so thoroughly interjected his own view of the case, but only as concerned the asserted defense. On balance, because the defense did not exist, the misconduct is not deemed prejudicial. Under the evidence and the law, it is not reasonably probable that there would have been a result more favorable to appellant in the absence of the asserted misconduct. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Delzell* v. *Day* (1950) 36 Cal.2d 349, 352 [223 P.2d 625].)

The judgment is affirmed. Respondent is to recover costs.

Brown (H. C.), Acting P. J., and Scott, J., concurred.

A petition for a rehearing was denied May 9, 1975, and appellants' petition for a hearing by the Supreme Court was denied June 4, 1975.