KORNS v. THOMSON & McKINNON et al.

No. 2786.

District Court, D. Minnesota, Third Division.

March 7, 1938.

**SULLIVAN, District Judge.**

This is a suit in conversion to recover from the defendants the value of certain stocks of which the plaintiff and his assignors claim ownership, and which are alleged to have been wrongfully converted by the defendants.

The defendant Thomson & McKinnon is a copartnership, and now is, and prior to July, 1933, was, engaged in the stock brokerage business, with its principal office in New York City, and maintaining branch offices in Chicago, Ill.; Toronto, Canada; Minneapolis and St. Paul, Minn.; and Boston, Mass. Some of the copartners are members of the Chicago Board of Trade and the commodity exchanges in New York and Boston, and other exchanges in the United States.

For several years prior to July, 1933, Leon Strauss, Bertram Strauss, and Mrs. John Harper conducted a stock and commodity brokerage business in Des Moines, Iowa, as a partnership, under the firm name of Harper Strauss & Company. This partnership was authorized and licensed to do business in the state of Iowa. Leon

Strauss was a member of the Chicago Board of Trade, but he and his copartners were not members of any other stock or commodity exchange in the United States.

The defendants handled a large volume of the business of Harper Strauss & Co., in the execution of orders for the purchase and sale of stocks, bonds, and commodities on the various exchanges and markets referred to.

In 1930 Harper Strauss & Co. entered into a contract with the defendants whereby in effect the latter agreed to furnish the former, free of charge, a wire service, in return for which Harper Strauss & Co. agreed to use the defendants as its exclusive correspondent broker for the execution of orders of Harper Strauss & Co., for itself or for its customers, to buy and sell stocks and bonds in the New York Stock Exchange and other exchanges, and to buy and sell stocks, bonds, grain, and other commodities on the Chicago Board of Trade, and other grain and commodity markets. This agreement was in force in the early summer of 1933, when the transactions involved in this litigation occurred. The agreement between these two brokerage firms provides, among other things, that any and all securities, commodities, credit balances, and other property, held by Thomson & McKinnon for the account of Harper Strauss & Co., should stand as security for any and all indebtedness of Harper Strauss & Co., to Thomson & McKinnon. The agreement also provides for a sale of all the pledged securities, etc., without notice, in the event that it is necessary for the protection of the defendants. On the stock, grain, and commodity transactions on the Chicago Board of Trade, Harper Strauss & Co., was charged by the defendants one-half of the full commissions on such transactions. There was no division of commissions, as it is generally understood. Harper Strauss & Co. could charge its own customers as it pleased.

Harper Strauss & Co. had one account with the defendants, and this account was divided into a so-called "stock account" and a "commodity account" for convenience in bookkeeping.* Balances were shifted back and forth between the accounts from time to time in accordance with an arrangement between the two brokerage companies. The stocks involved in this litigation were bought on the New York Stock Exchange. It was the custom that stocks purchased on that Exchange were carried in the name of Thomson & McKinnon and commonly called "street stocks." It was also the custom that, when a customer "ordered out" the stock, Thomson & McKinnon would take the certificate to the transfer agent in New York and cause the same to be transferred and registered in the name of the customer who had purchased it, and in due course it would be delivered to the customer. If stocks were bought on margin by Harper Strauss & Co.'s customers, they were left with Thomson & McKinnon until fully paid for and "ordered out." On grain transactions it was the custom in July, 1933, and prior thereto, that the customers of Harper Strauss & Co. buying grain on future delivery contracts deposit with Harper Strauss & Co. margins as were required. If the price went down additional margins were required, and, of course, if the price advanced, no additional margins were required. On all purchases of grain through the defendants, proportionate margins were required to be maintained.

When the Harper Strauss & Co.'s "commodity account" had cash in excess of the requirements of the defendants, part of such account was transferred to the account known as the "stock account," the reason for this being that the defendants paid interest on excess balances in the so-called "stock account," and paid no interest on excess balances in the so-called "commodity account," and since the defendants charged Harper Strauss & Co. interest on overdrafts or advances by it on such so-called "stock account."

In July, 1933, and prior thereto, the Iowa-Des Moines National Bank of Des Moines, Iowa, maintained a department for the purchase and sale of stocks and bonds

---

*At all times hereinabove mentioned, Thomson & McKinnon, for convenience in keeping its account with Harper Strauss & Company, divided said account into a so-called "stock account" and a "commodity account."

"It was a matter of instructions and contract, so to say; Harper Strauss & Company had one account with us, but in order to facilitate matters and accommodate things, we ran two ledgers, a commodity ledger and a stock ledger * *." (Quotation from testimony of Henry T. Hermes, employee of Thomson & McKinnon).

for its customers. On July 18, 1933, F. R. Korns, the plaintiff in this case, by written order, directed this bank to purchase for him through its brokers, "subject to the rules of the exchange where the order is executed," 100 shares of United States Steel at $65.50 per share. On the same day he requested, by a similar order in writing, the bank to purchase for him 100 shares of United States Rubber at $22 per share. An officer of said bank handled these transactions and placed an order with Harper Strauss & Co. for the purchase of such shares. On July 19, 1933, Harper Strauss & Co. notified the bank by a confirmation slip containing the following language: "It is agreed, between the agent and customer: 1. That all orders for the purchase or sale of securities are received and executed subject to the rules and customs of the exchange or market (and its Clearing House if any) where they are executed."

The bank, through its officer, notified the plaintiff of the purchase of such shares of stock, and thereupon Mr. Korns gave the bank his check for $8,787.88, the purchase price of the stock, including commissions and tax. On July 20, 1933, the bank gave to Harper Strauss & Co. a cashier's check in that sum to cover the purchase price of the shares of stock, including all charges thereon, and at the time the bank delivered to Harper Strauss & Co. its cashier's check to cover the purchase price it directed that company to "order out" the shares of stock in the name of F. R. Korns. This cashier's check was deposited in Harper Strauss & Co.'s account with that bank on July 20, 1933. This stock was purchased by the defendants on the New York Stock Exchange pursuant to an order placed with it by Harper Strauss & Co.

On July 15, 1933, Litta Tumbleson directed the same bank to purchase for her 26 shares of stock of the American Telephone & Telegraph Company, and 225 shares of Superior Oil stock, on written order in the same form as that used in the Korns transaction. On the same date an officer of the bank telephoned the order to Harper Strauss & Co. to buy this stock. On July 20, 1933, Harper Strauss & Co. confirmed the buying of such stock on a confirmation slip in the same form as that used in the Korns transaction. On July 20, 1933, the bank paid Harper Strauss & Co., the sum of $4,172.88, the amount of the purchase

price of said stock, together with charges and taxes thereon, and this check was deposited in the Iowa-Des Moines National Bank by Harper Strauss & Co. on July 20, 1933.

On July 19, 1933, Miss Tumbleson directed Harper Strauss & Co. to purchase for her 200 shares of Superior Oil stock at $3 per share upon a written order in the same form used in the previous transactions. On July 20, 1933, an officer of the bank telephoned the order to Harper Strauss & Co., and on the same date the order was confirmed by Harper, Strauss & Co. by a written confirmation slip in the same form as used in the other transactions. On July 21, 1933, the bank delivered to Harper Strauss & Co. its check for $615, which amount was deposited in the account of Harper Strauss & Co., and the officer of the bank orally directed Harper Strauss & Co. to "order out" the stock in the name of Miss Tumbleson. These shares of stock were purchased by the defendants on the New York Stock Exchange at the direction of Harper Strauss & Co. The claim of Miss Tumbleson has been assigned to the plaintiff herein.

Estelle Mandelbaum, acting through her husband, on July 20, 1933, purchased 100 shares of United Aircraft stock. This order was given direct to Leon Strauss, a member of the firm of Harper Strauss & Co. This stock was purchased on July 20, 1933, on the New York Stock Exchange by the defendants and charged to Harper Strauss & Co. in the sum of $4,015. On July 21, 1933, Mrs. Mandelbaum's husband delivered to Harper Strauss & Co. her check in the sum of $4,017.50, this including Harper Strauss & Co.'s charges. This check was deposited in the account of that company. Harper Strauss & Co. was directed to "order out" the stock in the name of Estelle Mandelbaum. This account was transferred and assigned to the plaintiff herein.

On July 11, 1933, Sidney Mandelbaum gave Harper Strauss & Co. an order in writing in the same form used in the other transactions to purchase 200 shares of Schulte Retail Stores stock. This order was executed by the purchase of the shares of stock on July 12, 1933, by the defendants, and Harper Strauss & Co.'s account was charged by the defendants with $2,025 on that date. On July 19, 1933, Sidney Mandelbaum gave Harper Strauss & Co. an order in writing to buy 100 shares of

Commercial Solvents stock. This order was executed by the purchase of said stock by the defendants on July 20, 1933, upon the direction and order of Harper Strauss & Co., and the defendants charged to Harper Strauss & Co. the sum of $4,815.00, being the purchase price, including charges, commissions, and tax on said stock on said transaction. A sum of money equal to the purchase price for these stocks was charged to the account of Sidney Mandelbaum on the books of Harper Strauss & Co., he, on July 20, 1933, having a credit balance in excess of that amount, and these stocks, by directions to Harper Strauss & Co., were "ordered out." The Sidney Mandelbaum claim was also transferred and assigned to the plaintiff herein.

At no time did Harper Strauss & Co. direct, nor did the defendants ever receive any order or direction as to "ordering out" said stocks or securities, or any of them.

On July 24, 1933, Harper Strauss & Co. filed its voluntary petition in bankruptcy in the United States District Court for the Southern District of Iowa, Central Division. It was on that same day adjudged to be a bankrupt, and a receiver was appointed and qualified on July 25, 1933. Schedules of assets and liabilities were filed September 1, 1933, and at the first meeting of creditors a trustee was appointed.

Grain markets took a rapid break on July 19, 1933, and on July 21, 1933, the Board of Trade at Chicago was closed because of the situation in the market, and there was no grain market on July 21st and 22d. The stock markets dropped rapidly, and at the close of business on Thursday, July 20, 1933, the defendants called Harper Strauss & Co. for additional margins in the "commodity account." On Saturday, July 22, 1933, John Harper, of Harper Strauss & Co., called at the Thomson & McKinnon offices in Chicago, and at that time the defendants received information to the effect that Harper Strauss & Co. was insolvent, and that it could not meet the demands for additional margins. On Monday, July 24, 1933, Harper Strauss & Co. wired the defendants to close out stocks, bonds, and grain transactions, and thereupon the defendants closed out the grain transactions, ascertained the loss, and sold all the stocks in their possession belonging to Harper Strauss & Co., including the stocks involved in this litigation, and, after deducting the grain losses and the amount Harper Strauss & Co. owed Thomson & McKinnon for stocks, transmitted the balance to the receiver in bankruptcy, amounting to $20,615.

On July 20, 1933, Harper Strauss & Co. transmitted by wire to Thomson & McKinnon the sum of $45,000. This was done after the payment by plaintiff and his assignors of an amount equal to the purchase price of the stock which they had ordered through Harper Strauss & Co., to it.

In 1933, more than $100,000 over the transfers from the stock account to the grain account was shifted from the grain account to the stock account, although on July 19, 1933, payments aggregating $115,000 from and out of the stock account were made by the defendants to and for the benefit of Harper Strauss & Co., and on said date checks in the sums of $63,400 and $30,000 were issued and delivered by Harper Strauss & Co. to M. Zinsmaster, in payment of certain grain transactions had by Zinsmaster in the commodity market, which transactions were handled by Harper Strauss & Co. through the defendants.

Up to the night of July 20, 1933, the Harper Strauss & Co. account was in good shape and had an excess requirement, and stocks could have been delivered out if the same had been "ordered out," but on the 21st of July the condition of the account was entirely different.

On July 25, 1933, the defendants held stocks and securities of Harper Strauss & Co. of the value of about $108,810. Harper Strauss & Co. owed defendants on stocks and securities about $54,000, and on grain transactions and other adjustments about $34,195. After these deductions were made, there was a balance of $20,615, which was remitted by defendants to the trustee in bankruptcy.

■ 1. It is the contention of the plaintiff that the defendants were partners with Harper Strauss & Co. on grain transactions. This contention, however, is not supported by the evidence. There was no partnership agreement in existence, no splitting of profits or losses, and none of the dealings between the two firms indicate in any way that a partnership existed. The relationship existing between the two partnerships is one which exists between two separate brokerage firms situated in different cities.

It is stated in Meyer on Stock Brokers (section 124) that, if a broker is not himself a member of the exchange on which

the order is to be executed, he must, of course, employ another brokerage house to execute it and to "clear" the trade, and that, even if he is a member of the exchange, he may find it advantageous, on account of his own limited facilities, to employ other members of the exchange to execute the order and to "clear" the trade. Harper Strauss & Co. was located at Des Moines, Iowa. Some members of the defendant company were members of the Chicago Board of Trade and also of the New York Stock Exchange, and it was no doubt advantageous and economical for Harper Strauss & Co. to have an arrangement whereby the defendants executed its orders and "cleared" its trade.

All profits and losses of the respective companies were borne by the respective companies. There was no sharing of the same by these two brokerage houses. Harper Strauss & Co.'s commissions were not fixed. It could charge its customers what it wished. It kept its own customers' margins, its own bank account, and kept whatever profits it might make. On the other hand, the defendant company sustained its own losses and kept what profits it made, without division with Harper Strauss & Co. It is true that the defendants furnished a private wire to Harper Strauss & Co., but this alone does not constitute proof of partnership, and it was obviously an inducement on the part of the defendants to secure the trade and business of Harper Strauss & Co.

Plaintiff relies on Board of Trade of City of Chicago v. Hammond Elevator Company, 198 U.S. 424, 25 S.Ct. 740, 49 L. Ed. 1111, in support of his contention. That case is not in point, since the question involved therein was solely as to whether the defendant was doing business in the state of Illinois through an agent, so as to permit service of process on the agent, and the factual situation in that case and the one at bar is not comparable.

The evidence in this case does not disclose a partnership relationship between the defendants and Harper Strauss & Co., nor does it give rise to the relationship of principal and agent. It signifies only a convenience and economy in the transaction of business with Harper Strauss & Co.

■ 2. When the plaintiff and his assignors caused their orders for the purchase of certain stocks to be given to Harper Strauss & Co., they understood, or should have understood, that the orders were for execution in the New York Stock Exchange. They knew, or should have known, the relation of Harper Strauss & Co. to this Exchange, and its mode of transacting business therein through other brokerage houses. They must be held to have contemplated and authorized a course of dealing in accordance with the rules and customs of the New York Stock Exchange.

"A person dealing at a particular market will be taken to have dealt according to the known general customs and usages of that market; and, if he employs others to act for him in buying and selling at such market, he will be held as intending that the business should be conducted according to such general usage and custom of such market; and this has been held to be the rule whether he in fact knows of the custom or not." Samuels v. Oliver, 130 Ill. 73, 22 N.E. 499, 500. See, also, Taylor v. Bailey, 169 Ill. 181, 48 N.E. 200. To the same effect is the case of Skiff v. Stoddard, 63 Conn. 198, 26 A. 874, 28 A. 104, 21 L.R. A. 102.

The plaintiff and Tumbleson, his assignor, at the time of giving the order for the purchase of certain stock, filed a "customer's buying order" which contained the following language: "Please buy for my account and risk, on my unsolicited order through your brokers, subject to the rules of the Exchange where the order is executed, the following securities"; and thereafter the customers interested in this suit received the confirmation slips referred to hereinbefore.

■ The agreement between the defendants and Harper Strauss & Co. (Exhibit 1) provides as follows: "6. Any and all securities, commodities, contracts for the purchase or sale of commodities, credit balances and other property held or carried by you for the account of the undersigned shall stand as security for any and all of the indebtedness of the undersigned to you, however arising, and in whatever account appearing. Whenever the undersigned shall carry more than one account with you, you may at any time charge any one or more of said accounts with any sum upon crediting any other or others of said accounts with the same sum." This provision of the contract is in accordance with the custom of the New York Stock Exchange. All of the securities involved in this suit were purchased on the New York Stock Exchange.

The defendants had a lien in and upon stocks which they purchased for and on behalf of Harper Strauss & Co., and the only circumstance which might defeat this lien right of the defendants would be their want of good faith.

It appears from the evidence that Harper Strauss & Co. was indebted to the defendants in a large sum of money, and that, upon the defendants being advised by Harper Strauss & Co. to close out its stocks, it sold the stocks and other securities and commodities of Harper Strauss & Co. at the market price, on July 24 and 25, 1933, and realized from the sale of such stock, securities, and commodities an amount sufficient to take up the indebtedness then owing by Harper Strauss & Co. to the defendants, and leaving a balance of $20,615, which amount was turned over to the trustee in bankruptcy in the estate of Harper Strauss & Co.

The evidence is clear that the defendants were bona fide pledgees for value of all of the stocks and securities in their possession which were credited on their books to Harper Strauss & Co. There is no evidence in the record upon which bad faith on the part of the defendants can be based. The business relations between these two brokerage concerns had been in existence for a long period of time. No irregularities in any transaction between them have been disclosed, nor have any irregularities or sharp dealings on the part of Harper Strauss & Co. with its customers been hinted at in the testimony prior to the date of its insolvency, and the court must infer from the evidence that at all times previous to the insolvency of Harper Strauss & Co. it enjoyed the confidence of its customers and at least one of the banks in Des Moines, Iowa. Therefore, the court must necessarily conclude that the defendants had no notice or knowledge of any wrongful or fraudulent dealings on the part of Harper Strauss & Co., for apparently the same did not exist prior to its insolvency, save and except that the stocks which the plaintiff and his assignors had purchased were not immediately "ordered out" after the same were paid for and directed to be issued in the names of the purchasers. The evidence in this case is that the defendants never received any notice of it being "ordered out," and it affirmatively appears that no such order or direction was ever given by Harper Strauss & Co.

The plaintiff contends that Thomson & McKinnon should be charged with notice that the securities were not the property of Harper Strauss & Co., and that they were the property of some customer of that brokerage house.

It is stated in Austin v. Hayden, 171 Mich. 38, 137 N.W. 317, Ann.Cas.1915B, 894, that a broker has the right to subpledge and borrow money on margined stocks which he holds from separate customers en bloc, commingled and delivered for the purpose of obtaining capital required to carry his customers' purchases; and that as to stocks held as security by a subpledgee for the indebtedness of the broker and acquired in the usual course of business, either by purchase on the Stock Exchange in filling orders or forwarded from the broker to his correspondent broker, endorsed or assigned in blank, the customers and owners by entrusting their stocks so endorsed, either by delivery or by authorizing their purchase by the broker for them through the channels of trade, invested their brokers, who were dealing with the public in that special line, with the indicia of ownership, thus putting into the hands of such brokers the power to appear as the true owner and perpetrate the frauds complained of, and that the owner is estopped from asserting a paramount interest against an innocent purchaser or an innocent pledgee who has acquired the stock in the usual course of trade without notice and in good faith. In the case of Austin v. Hayden, there was strong evidence of a want of good faith on the part of the subpledgee, and the case was determined upon the question of good faith.

Meyer, on Stock Brokers, states: "The fact that the broker's pledgee knew that the securities deposited were those of the broker's customers likewise is insufficient proof of knowledge of the customers' rights."

It is claimed by the plaintiff that there was a conversion of the stocks and securities. The stocks and securities never became the property of the plaintiff. There was a conversion by Harper Strauss & Co. of the moneys which had been paid to that company by the plaintiff and his assignors for the purchase of the stocks. There was a want of good faith on the part of, and fraud practiced by, Harper Strauss & Co. on its customers, but does this want of good faith and fraud on the part of Harper Strauss & Co. affect the defendants in any respect? Under all the authorities called to the attention of the court, a presumption attached that the defendants, having come into the possession of the se-

curities lawfully, had the right to sell them to protect their lien rights thereon.

It is stated in Kittredge v. Grannis, 244 N.Y. 168, on page 178, 155 N.E. 88, 91: "Mere negligence in taking a negotiable instrument is not enough. Cheever v. Pittsburgh, etc., R. R. Co., 150 N.Y. 59, 44 N.E. 701, 34 L.R.A. 69, 55 Am.St.Rep. 646. There must be bad faith. Actual notice on the part of the transferee of the defect in title is sufficient proof on this point. Less may make a question of fact. Gross carelessness (Canajoharie Nat. Bank v. Diefendorf, 123 N.Y. 191, 25 N.E. 402, 10 L.R.A. 676), knowledge of facts that would create suspicion in the mind of a prudent man (Seybel v. Nat. Currency Bank, 54 N. Y. 288, 13 Am.Rep. 583), circumstances that otherwise fairly raise the question of his bad faith and create reasonable grounds for suspecting his conduct in the transaction (American Ex. Nat. Bank v. N. Y. Belting, etc. Company, 148 N.Y. 698, 43 N. E. 168; Second Nat. Bank v. Weston, 172 N.Y. 250, 64 N.E. 949), permit the inference that his conduct was not innocent."

It is settled law that, if the securities converted were the property of the plaintiff, the latter cannot complain of any acts of the defendants which were lawful, against Harper Strauss & Co. See Thompson v. St. Nicholas National Bank, 113 N. Y. 325, 21 N.E. 57; Land Oberoesterreich v. Gude, 2 Cir., 86 F.2d 621; Connolly v. People's State Bank, 260 Mich. 352, 244 N. W. 500.

The rights which the plaintiff has against Harper Strauss & Co. and those which he has against the defendants are entirely different. The distinction in the rights and remedies which a customer has against the initial broker and those which he has against the subpledgee are illustrated in the case of Wahl v. Tracy, 139 Wis. 668, 121 N.W. 660.

In the case at bar, there was a relationship of customer and broker existing between the defendants and Harper Strauss & Co. This relationship did not exist between the plaintiff, his assignors, and the defendants. The relationship of customer and broker existed between plaintiff, his assignors, and Harper Strauss & Co. The plaintiff and his assignors were customers of Harper Strauss & Co., and Harper Strauss & Co. was a customer of the defendants. The securities in question were never in the hands or under the control of the plaintiff and his assignors. The fact that Harper Strauss & Co. had received payment from plaintiff and his assignors to cover the purchase price of these stocks in no manner affected the rights of the defendants. They had no information with respect to this payment. They were dealing entirely with Harper Strauss & Co., and they were holding these securities as the property of Harper Strauss & Co., and as security for the indebtedness due from Harper Strauss & Co. to them, and under these circumstances it is clear that the defendants had a right to hold such securities until the indebtedness due and owing them from Harper Strauss & Co. was paid. It is urged that the defendants must have known that Harper Strauss & Co. was acting for other people. It may be true that the defendants knew that Harper Strauss & Co. was giving these orders for the purchase of stock on behalf of other people, but, as was stated in Willard v. White, 56 Hun 581, 10 N.Y.S. 170, 173, "what other people, or who they were," or whether in fact Harper Strauss & Co. was operating on its own account, "they had no means of knowing and no reason to surmise." The defendants were dealing with Harper Strauss & Co., and with it alone, and they looked to Harper Strauss & Co. for the payment of its account, and held these securities, received by purchase by them for Harper Strauss & Co., as security therefor. The defendants had the right to hold these securities for the purpose of securing the payment of the balance due to them from Harper Strauss & Co., and had the right to sell such securities with others and, from the proceeds of the sale thereof, satisfy the indebtedness owing to them by Harper Strauss & Co.

3. The plaintiff complains that the defendants used the stocks bought for them by the defendants upon the order of Harper Strauss & Co. in applying the proceeds of the sale of such stocks to the payment of losses by Harper Strauss & Co. or its customers upon the commodity market. There is no basis for such complaint. The agreement, Exhibit 1, par. 6, provides that any and all securities shall stand as security for any and all of the indebtedness of Harper Strauss & Co. to the defendants, however arising.

The defendants had a right under this contract to sell the securities in their hands, credited to the account of Harper Strauss & Co., and to satisfy from the proceeds of such sale or sales the indebtedness due

and owing to them however arising, whether in the commodity or the stock market, or for money borrowed.

 4. It is the contention of the defendants that the plaintiff and his assignors filed general claims in the bankruptcy proceedings of Harper Strauss & Co., thereby electing to proceed on an implied contract, and, by so doing, ratified the acts of Harper Strauss & Co. and the sale of the securities by the defendants, and waived their rights to sue in tort for a conversion of the stocks.

The general rule is that one who has voluntarily chosen and carried into effect an appropriate legal remedy with full knowledge of the facts is barred from pursuing another inconsistent remedy, even though no injury has been done by his choice, or would result from resorting to the other remedy. Dunnell's Digest, § 2914.

One whose property has been converted by others may maintain an action in tort against the wrongdoer, or he may waive the tort and sue upon an implied contract to recover the value of his property, but he cannot maintain an action upon an implied contract as against some of the wrongdoers, and then an action in tort against other wrongdoers. Shonkweiler v. Harrington et al., 102 Neb. 710, 169 N.W. 258, and cases cited therein; Standard Varnish Works v. Haydock, 6 Cir., 143 F. 318; In re Jacob Berry & Co., 2 Cir., 174 F. 409.

In the case of Thomas v. Taggart, 209 U.S. 385, 28 S.Ct. 519, 52 L.Ed. 845, a claimant filed claim against the bankrupt's estate for the value of stock wrongfully hypothecated by bankrupt, and also for a cash balance due him, and specifically stipulated in his proof of claim that he did not waive any right of action that he had to recover the certificate or value thereof. The court held that, by reason of the specific reservation, the claimant did not waive any right he might have to recover the shares of stock, or the value thereof.

In the claims filed in the bankruptcy court in the case at bar, it was claimed that of the funds which came into the hands of the trustee certain specific sums were the proceeds from the sale of the securities of the claimant, and that the respective claimant was entitled to have returned to him the specifically described stock, or the proceeds thereof, in the hands of the trustee, and prayed an order of the court requiring the trustee to turn over and deliver to the respective claimant his respective stock certificates, or the amount realized from the sale thereof. The so-called claims are not claims within the purview of section 57n of the Bankruptcy Act, as amended, 11 U.S.C.A. § 93(n); the so-called claims are petitions for restoration of their own property, section 70, as amended, 11 U.S.C.A. § 110, pp. 516, 517. Bowman et al. v. Mac Pherson et al., 10 Cir., 93 F.2d 318.

The so-called claims filed disclose no intention on the part of the claimants to elect a remedy inconsistent with one now applied for, but the claims, on the other hand, do show that the claimants wanted either the securities which they claimed to own or the value thereof.

The claims of the plaintiff, his assignors, and others in the same position were allowed in the bankruptcy court, and the sum of money received from the defendants, to wit, $20,615, was pro rated among the claimants. The balance of the claims were allowed as general claims against the bankrupt's estate, but under the rule set out in Thomas v. Taggart, supra, there was not such an election of remedies as would bar the plaintiff in the prosecution of this suit.

It is the opinion of the court that any right plaintiff and/or his assignors had in and to the stocks involved in this action were and are inferior to the rights of the defendants.